David F. ROTH, for himself and for all others similarly situated, Plaintiff,

v.

The BOARD OF REGENTS OF STATE COLLEGES and Roger E. Guiles, Defendants.

No. 69-C-24.

United States District Court, W. D. Wisconsin.

March 12, 1970.

Charles D. Hoornstra, Madison, Wis., Steven Steinglass, Milwaukee, Wis., for plaintiff.

Charles R. Bleck, Asst. Atty. Gen., Madison, Wis., for defendants; E. L. Wingert, Madison, Wis., of counsel, for respondent.

## MEMORANDUM AND ORDER

JAMES E. DOYLE, District Judge.

From the pleadings, depositions, and affidavits on file, I find that there is no genuine issue as to the following material facts:

Plaintiff was retained by the defendants as an assistant professor at Wisconsin State University-Oshkosh on a one-year contract for the school year 1968–1969. He had not attained tenured status under Wisconsin statutes. During the 1968–1969 school year at the university, there were disturbances and controversies concerning the university administration and the defendants. The plaintiff was vocal in his expressions of opinion with respect to such disturbances and controversies. Such expressions were critical of the university administrators and the defendant board of regents. The plaintiff was advised on January 30, 1969, by the defendant Guiles, the president of the university, purporting to act under due authority, that the plaintiff would not be offered an employment contract as a member of the university faculty for the school year 1969–1970; no reasons for the decision were given. The defendants did not offer the plaintiff a hearing of any kind on the merits of the deci-

sion. No hearing was requested by him; none was held. Of 442 non-tenured teachers at the university, four were given notice that contracts would not be offered them for 1969–1970.

The complaint alleges, among other things, that the reason for the decision not to offer plaintiff a contract for 1969–1970 was to retaliate against him for his expressions of opinion in the exercise of his freedom guaranteed by the First and Fourteenth Amendments; that the decision was not made under "ascertainable and definite standards governing the Defendants in making this decision"; and that the decision has caused and will cause damage to plaintiff's professional reputation and standing. The complaint seeks judgment that plaintiff's rights, and the rights of those similarly situated, under the First, Fifth and Fourteenth Amendments to the United States Constitution have been violated: by the very decision not to reemploy him; by failure of the defendants to provide a hearing as to the merits of said decision; by the refusal of the defendants to give reasons for their decision; and by defendants' failure to make such decision under ascertainable and definite standards. Further, the plaintiff's complaint seeks an order directing the defendants to employ him in his position as a member of the Wisconsin State University-Oshkosh faculty for the school year 1969–1970.

Among other things, the answer denies that the reason for the decision was to retaliate against plaintiff for his expressions of opinion, alleges that the reasons for the decision were that the plaintiff was guilty of substantial neglect and violation of duty, violation of university rules, and insubordination, denies that this court enjoys jurisdiction of the action, and alleges that the complaint fails to state a claim upon which relief can be granted.

Plaintiff has moved for partial summary judgment: declaring that he is entitled to a hearing on the merits of the decision not to retain him, and requiring the defendants either to provide such a hearing or to offer him a contract for the 1969–1970 school year; and also, apparently in the alternative, declaring that his constitutional rights have been violated because the decision of non-retention was not made under ascertainable and definite standards, and requiring the defendants to offer him a contract for the 1969–1970 school year.

Defendants have moved for summary judgment dismissing the action on its merits because the complaint fails to state a claim upon which relief can be granted, because the undisputed facts show that no federal constitutional right of plaintiff has been violated by defendants, and because plaintiff has failed to exhaust his administrative remedies.

This opinion and order is confined to the competing motions for summary judgment.

Jurisdiction is present. 28 U.S.C. § 1343(3), (4); 42 U.S.C. § 1983.

### Defendants' Motion for Summary Judgment

Defendants raise, directly or indirectly, three threshhold questions: whether defendants are "persons" within the meaning of 42 U.S.C. § 1983; whether defendants enjoy the protection of sovereign immunity; and whether defendants enjoy common law immunity.

Neither defendant is a municipal corporation. See Monroe v. Pape, 365 U.S. 167, 81 S.Ct. 473, 5 L.Ed.2d 492 (1961). This is an action for declaratory and injunctive relief, not damages. See United States ex rel. Lee v. State of Illinois, 343 F.2d 120 (7th cir. 1965); Schnell v. City of Chicago, 407 F.2d 1084, 1086 (7th cir. 1969); Adams v. City of Park Ridge, 293 F.2d 585, 587 (7th cir. 1961). For the purposes of this action, defendants are "persons" under 42 U.S.C. § 1983.

Neither the Eleventh Amendment nor the doctrine of Hans v. Louisiana, 134 U.S. 1, 10 S.Ct. 504, 33 L.Ed. 842 (1890), affords these defendants the shield of sovereign immunity in this action for declaratory and injunctive relief

in which it is alleged that, acting under color of state law, they have deprived plaintiff of rights secured to him by the Constitution of the United States. Ex parte Young, 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908); Whitner v. Davis, 410 F.2d 24 (9th cir. 1969); Louisiana State Board of Education v. Baker, 339 F.2d 911 (5th cir. 1964); Board of Supervisors of Louisiana State University v. Fleming, 265 F.2d 736 (5th cir. 1959); Orleans Parish School Board v. Bush, 242 F.2d 156 (5th cir. 1957), cert. den., 356 U.S. 969, 78 S.Ct. 1008, 2 L. Ed.2d 1074; School Board of City of Charlottesville v. Allen, 240 F.2d 59 (4th cir. 1956), cert. den. School Bd. of Arlington County v. Thompson, 353 U.S. 910, 77 S.Ct. 667, 1 L.Ed.2d 664; Dorsey v. State Athletic Commission, 168 F.Supp. 149 (E.D. La. 1958), aff'd 359 U.S. 533, 79 S.Ct. 1137, 3 L.Ed.2d 1028.

█ The purpose of common law immunity enjoyed by the judiciary and legislature, here sought to be extended in a qualified form to the defendant Board and university president, is to preserve the integrity and independence of those bodies, and to insure that judges and legislators will act on their free, unbiased convictions, uninfluenced by apprehensions of consequences. Tenny v. Brandhove, 341 U.S. 367, 71 S.Ct. 783, 95 L.Ed. 1019 (1951); Bauers v. Heisel, 361 F.2d 581 (3rd cir. 1966), cert. den., 386 U.S. 1021, 87 S.Ct. 1367, 18 L.Ed.2d 457; Kenney v. Fox, 232 F.2d 288 (6th cir. 1956), cert. den., 352 U.S. 855, 77 S.Ct. 84, 1 L.Ed.2d 66. Such considerations do not support extending, nor have courts extended, the doctrine to shield officials from the type of equitable relief here requested.

We reach the major grounds of defendants' motion for summary judgment of dismissal.

The defendants' principal contention is to this effect: Plaintiff was hired for a one year period. There was no breach or threatened breach of that contract by the defendants. As a non-tenured teacher, plaintiff can be removed "at pleasure" under Sec. 37.11(3), Wis.

Stats. Such complete discretion in defendants is essential to keep the faculty at the "highest level of competency, responsibility, and devotion to duty". The administrative decision not to re-hire can be reached for "no reason or any reason". It follows that no statement of reasons need be given, nor hearing offered.

If a decision not to renew the employment contract of a non-tenured university professor may be based consciously and deliberately on the fact that he has written a scholarly letter to the newspaper in support of the President's policy on Viet Nam, or on the fact that he is white, or on the fact that he is a Protestant, or on the fact that he is a Republican, and if the decision may be based on the university president's belief that the professor physically struck a student at a certain time and place, whereas in fact the professor was not present at that time and place and the incident never occurred, and if there need be no reasoned basis whatever for the decision, then it may be concluded that the Constitution of the United States affords him no substantive protection. If he enjoys no substantive protection under the Constitution—that is, if the decision not to renew may be based upon any reason or may be based upon no reason—then it also follows that he need be afforded no procedural protection by the Constitution; to require the university administration to state the reason for the decision, or to state that there is no reason for the decision, or to provide an opportunity to the professor to be heard, would serve no purpose.

On the other hand, if the Constitution of the United States forbids a decision consciously and deliberately based on the professor's otherwise protected speech activity, or his race, or his religion, or his political affiliation, then this substantive right may require procedural protection. (For the purposes of this opinion, for convenience and brevity, I will refer to an alleged right of this kind as a "First Amendment" right, although this does not accurately reach

the matter of racial discrimination, for example.)

Also, if the Constitution forbids a decision based upon a wholly false assumption (for example, that the professor struck the student), or if it forbids a decision which is wholly unreasoned, then this substantive right may also require procedural protection. (For convenience, I will refer to an alleged right of this kind as a right to be protected against an "arbitrary" decision.)

 With respect to substantive protection of a professor's "First Amendment" rights, the rule is crystal clear. The employment of a teacher in a public school cannot be terminated because he has exercised that freedom secured to him by the Constitution of the United States. Pickering v. Board of Education, 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968); Keyishian v. Board of Regents, 385 U.S. 589, 605, 606, 87 S.Ct. 675, 17 L.Ed.2d 629 (1967); Slochower v. Board of Higher Education, 350 U.S. 551, 76 S.Ct. 637, 100 L.Ed. 692 (1956); Wieman v. Updegraff, 344 U.S. 183, 73 S.Ct. 215, 97 L. Ed. 216 (1952); Pred v. Board of Public Instruction, 415 F.2d 851 (5th cir. 1969); McLaughlin v. Tilendis, 398 F.2d 287 (7th cir. 1968); Bomar v. Keyes, 162 F.2d 136 (2d cir. 1947), cert. den. 332 U.S. 825, 68 S.Ct. 166, 92 L.Ed. 400. This substantive constitutional protection is unaffected by the presence or absence of tenure under state law. Johnson v. Branch, 364 F.2d 177 (4th cir. 1966), cert. den. 385 U.S. 1003; see McLaughlin v. Tilendis, *supra*; Bomar v. Keyes, *supra*; Lucia v. Duggan, 303 F.Supp. 112, 118 (D. Mass. 1969). Nor is it material whether employment is terminated during a given contract period, or not renewed for a subsequent period. McLaughlin v. Tilendis, *supra*.[1]

With respect to substantive protection against arbitrary non-retention, there is some uncertainty in the present state of the law. To test the point, we must assume a situation in which there is in fact no "First Amendment" problem; that is, the basis for non-retention is definitely not that the professor has exercised that freedom secured to him by the Constitution. The question, then, is whether the Fourteenth Amendment permits non-retention on a basis wholly without factual support, or wholly unreasoned.

The most recent guidance from the Supreme Court appears to be Cafeteria Workers v. McElroy, 367 U.S. 886, 81 S. Ct. 1743, 6 L.Ed.2d 1230 (1960). Rachel Brawner was employed as a cook by a private firm which operated a food concession on the premises of the Naval Gun Factory. Access to the Factory grounds depended upon an identification badge. Mrs. Brawner was required by the government's security officer to turn in her pass. The stated reason was that she had failed to meet the security requirements of the installation; no more specific reason was stated. There was no hearing provided. The effect of surrendering the badge was to lose access to the site of Mrs. Brawner's job as a cook.

The Court stated that it was required first to determine "the precise nature of the government function involved as well as of the private interest that has been affected by governmental action." 367 U.S., at 895, 81 S.Ct. at 1748–1749. The private interest affected "most assuredly was not the right to follow a chosen trade or profession. * * * Rachel Brawner remained entirely free to obtain employment as a short-order cook or to get any other job, either with [her then private employer] or with any other employer. All that was denied her was the opportunity to work at one isolated and specific military installation." 367 U.S., at 895–896, 81 S.Ct. at 1749. On the other hand, the governmental function involved was "as proprietor, to manage the internal operation of an important federal military establishment.

---

1. Because this distinction is not material in this Circuit for this constitutional purpose, I will use the term "non-retention" hereinafter to cover both situations.

\* \* \* In that proprietary military capacity, the Federal Government, \* \* \* has traditionally exercised unfettered control." 367 U.S. at 896, 81 S.Ct. at 1749.

There follows a puzzling passage (896–899, 81 S.Ct. 1749) in which the Court appears initially to affirm "a settled principle that government employment, in the absence of legislation, can be revoked at the will of the appointing officer" (896); then to acknowledge that United Public Workers v. Mitchell, 330 U.S. 75, 67 S.Ct. 556, 91 L.Ed. 754 (1947), and Wieman v. Updegraff, 344 U.S. 183, 73 S.Ct. 215, 97 L.Ed. 216 (1952), demonstrate "that the state and federal governments, even in the exercise of their internal operations, do not constitutionally have the complete freedom of action enjoyed by a private employer" (367 U.S. 897–898, 81 S.Ct. 1750); then to say that not all state and federal employees "have a constitutional right to notice and a hearing before they can be removed" (898, 81 S.Ct. 1750); then to "assume" that Mrs. Brawner "could not constitutionally have been excluded from the Gun Factory if the announced grounds for her exclusion had been patently arbitrary or discriminatory—that she could not have been kept out because she was a Democrat or a Methodist" (898, 81 S.Ct. 1750); and then to say that it does not follow "that she was entitled to notice and a hearing when the reason advanced for her exclusion was, as here, entirely rational and in accord with the contract" between the government and her private employer (which contract provided that the private firm should not continue to employ on that site persons who failed to meet the government's security requirements) (898, 81 S.Ct. 1750). Finally, the Court concluded that a determination that Mrs. Brawner "failed to meet the particular security requirements of that specific military installation" was not to "bestow a badge of disloyalty or infamy" upon her, and was not to impair her opportunities for employment elsewhere either by a public or private employer. (898–899, 81 S.Ct. 1750).

Four members of the Court, in dissent, observed that the Court had recognized the Mrs. Brawner's job as a short-order cook at a Gun Factory was constitutionally protected against termination "on grounds of her race, religion, or political opinion", but had seemed to say that "mere assertion by government that exclusion is for a valid reason forecloses further inquiry." 367 U.S. at 900, 81 S.Ct. at 1751. The dissenters expressed the view that Mrs. Brawner was entitled to some minimal procedures to apprise her in some detail of the reason for removing her badge, and to give her some opportunity to defend. Finally, the dissenters disagreed with the Court's estimate of the future consequences to Mrs. Brawner flowing from being characterized as a "security risk." 900–902, 81 S.Ct. 1743.

In the present case I consider myself bound by Cafeteria Workers v. McElroy to undertake the balancing process described there: that is, to determine "the precise nature of the government function involved as well as of the private interest that has been affected by governmental action." 367 U.S., at 895, 81 S.Ct. at 1748–1749.

Turning first to "the precise nature of \* \* \* the private interest \* \* \* affected," I start with the Court's observation that Mrs. Brawner's interest was "the opportunity to work [as a short-order cook] at one isolated and specific military installation." 367 U.S., at 896, 81 S.Ct. at 1749. The significance of the terms "isolated" and "specific" in this context is not easily grasped. Apparently the Court meant to contrast the termination of Mrs. Brawner's employment at the Gun Factory, with an order excluding her from employment as a short-order cook on the sites of all military installations, or to contrast it with an order revoking the license of a lawyer or a medical doctor or a real estate broker. The underlying significance appears to be that the ef-

fect of the termination was not seriously to limit Mrs. Brawner's future economic opportunities. The interest of the plaintiff here might also be viewed as "the opportunity to work [as a professor] at one isolated and specific university." The termination of this opportunity might also be contrasted with an order excluding him from employment at all universities and colleges, or with the revocation of the license of a lawyer or medical doctor or real estate broker. But the parallel with Mrs. Brawner's case falters here because the relationship between one cook and all prospective employers of short-order cooks differs, as I now judicially notice, from the relationship between one university professor and all prospective employers of university professors. Without disrespect, I think it fair to say that the discharge from one job is a lesser impediment in the search for another in the case of short-order cooks than in the case of university professors.

Turning to "the precise nature of the government function involved," I start again with the Court's observation in Cafeteria Workers v. McElroy. It found the government function there to be:

"[A]s proprietor, to manage the internal operation of an important federal military establishment. * * * In that proprietary military capacity, the Federal Government, * * * has traditionally exercised unfettered control." 367 U.S. at 896, 81 S.Ct. at 1749.

The emphasis here seems to be that the government function involved was proprietary rather than regulatory; that it was one of internal operation of an establishment; that the establishment was important; that it was military; and that there is a tradition of unfettered control by the federal government over its proprietary military installations. The interest of the state government in the present case is also proprietary rather than regulatory; it involves the internal operation of an establishment; and the establishment is important. The establishment is educational in nature, rather than military. Whether in its proprietary educational capacity the state government "has traditionally exercised unfettered control" is a question not instantly answerable. It seems fair to say, however, that historically the governance of public institutions of higher learning by the state has been less authoritarian than the governance of military installations by the federal government.

But to give effect to the balancing test of Cafeteria Workers v. McElroy obviously requires more than literal application of its language to the present situation, and more than labored comparisons between short-order cooks and professors, and between federal gun factories and state universities. We are dealing here with institutions of higher learning in this country, and perhaps abroad, and we are dealing with professors in those institutions.

I am called upon to consider the interest of the university in assembling and preserving a community of teachers and scholars. I am to consider how vital it is to this interest that during a relatively short initial interval, the university be free arbitrarily to decide not to retain a professor, so long as its decision is not based upon his exercise of freedoms secured to him by the Constitution. The concept of tenure obviously enjoys a rational basis, as well as a traditional basis. It is reasonable that there be a time in which to observe a new teacher and scholar and that the university retain during that time a considerable latitude in deciding whether he should remain. It is reasonable that after a period of time, or after the newcomer has won a certain measure of acceptance reflected in his academic rank, he should acquire rather strong protection against non-retention; such an arrangement is conducive to productive and perhaps controversial effort. Thus it is reasonable that there be available a very wide spectrum of reasons, some subtle and difficult to articulate and to demonstrate, for deciding not to retain a newcomer or one who has not yet won sufficient re-

spect from his colleagues. And it is reasonable that thereafter this available spectrum of reasons be sharply narrowed and confined to those amenable to articulation or demonstration.

The core issue here, however, is more difficult. No interest of the university is directly served by a regime in which a decision not to retain a newcomer may be made upon a basis wholly without support in fact or by a decision upon a wholly unreasoned basis. If the university is forbidden, constitutionally, to rest its decision on such an arbitrary basis, the question arises: in practice will the university become so inhibited that the available spectrums of reasons for non-retention in the two situations will merge, the distinction between tenure and absence of tenure will shrink and disappear, and the university will be unable to rid itself of newcomers whose inadequacies are promptly sensed and grave but not easily defined? It will not do to ignore this danger to the institution and to its central mission of teaching and research.

As against this danger, however, there is to be set the interest of the individual new professor. To expose him to non-retention because the deciding authority is utterly mistaken about a specific point of fact, such as whether a particular event occurred, is unjust. To expose him to non-retention on a basis wholly without reason, whether subtle or otherwise, is unjust. There can be no question that, in terms of money and standing and opportunity to contribute to the educational process, the consequences to him probably will be serious and prolonged and possibly will be severe and permanent. "Badge of infamy" is too strong a term, but it is realistic to conclude that non-retention by one university or college creates concrete and practical difficulties for a professor in his subsequent academic career.

■ The balancing test of Cafeteria Workers v. McElroy compels the conclusion that under the due process clause of the Fourteenth Amendment the decision not to retain a professor employed by a state university may not rest on a basis wholly unsupported in fact, or on a basis wholly without reason. This standard is intended to be considerably less severe than the standard of "cause" as the latter has been applied to professors with tenure. Unless this substantial distinction between the two standards is recognized in case-by-case application of the constitutional doctrine here enunciated, the rationale for the underlying doctrine will be gravely impaired. To be more direct, in applying the constitutional doctrine, the court will be bound to respect bases for non-retention enjoying minimal factual support and bases for non-retention supported by subtle reasons.

In deciding to afford to professors in a state university substantive protection against arbitrary non-retention, I am strengthened by an awareness that this is consistent with the development of the law with respect to public employment generally. The time is past in which public employment is to be regarded as a "privilege" which may be extended upon any conditions which public officials may choose to impose. See Van Alstyne, The Demise of the Right-Privilege Distinction in Constitutional Law, 81 Harv. L.Rev. 1439 (1968); Davis, the Requirment of a Trial-Type Hearing, 70 Harv.L.Rev. 193, 234 (1956). In Birnbaum v. Trussell, 371 F.2d 672, 678 (2d cir. 1966), after a review of the decisions of the Supreme Court and other courts, it was said that the "principle to be extracted from these cases is that, whenever there is a substantial interest, other than employment by the state, involved in the discharge of a public employee, he can be removed neither on arbitrary grounds nor without a procedure calculated to determine whether legitimate grounds do exist."

■ The latter comment brings me to a conclusion which follows inexorably from what I have said. Substantive constitutional protection for a university

professor against non-retention in violation of his First Amendment rights or arbitrary non-retention is useless without procedural safeguards. I hold that minimal procedural due process includes a statement of the reasons why the university intends not to retain the professor, notice of a hearing at which he may respond to the stated reasons, and a hearing if the professor appears at the appointed time and place.[2] At such a hearing the professor must have a reasonable opportunity to submit evidence relevant to the stated reasons. The burden of going forward and the burden of proof rests with the professor. Only if he makes a reasonable showing that the stated reasons are wholly inappropriate as a basis for decision or that they are wholly without basis in fact would the university administration become obliged to show that the stated reasons are not inappropriate or that they have a basis in fact.[3]

I conclude that the defendants' motion for summary judgment dismissing this action must be denied for the reason that it is undisputed that no statement of reasons for non-retention was given to the plaintiff, and no notice was given him that he would be heard at a stated time and place in response to the stated reasons.

Defendants' motion must be denied for another reason. They contend that the record in this court—by affidavits, depositions, and pleadings—makes it clear that the decision not to retain this particular plaintiff enjoyed a basis which was reasoned, supported in fact, and not violative of plaintiff's freedom of expression.

Defendants offer Pickering v. Board of Education, 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968), in support of the contention that plaintiff's statements referred to in section 2 of Dean Darken's memorandum (upon which memorandum defendant Guiles relied in deciding not to retain plaintiff) were not entitled to First Amendment protection. In *Pickering* the unsuccessful Board contended that "the teacher by virtue of his public employment has a duty of loyalty to support his superiors in attaining the generally accepted goals of education and that, if he must speak out publicly, he should do so factually and accurately, commensurate with his education and experience." *Pickering, supra,* at 568–569, 88 S.Ct. at 1735. Defendants make a similar argument here.

In "evaluating the conflicting claims of First Amendment protection and the need for orderly school administration", the court in *Pickering, supra,* "indicates some of the general lines along which an analysis of the controlling interests should run." *Pickering, supra,* at 569, 88 S.Ct. at 1735. Those guidelines coupled with certain controverted facts prevent summary judgment based upon this contention.

■ A teacher's freedom of speech cannot be limited unless it can be shown that his utterances harm a substantial

---

2. I do not intend to foreclose more considerate procedures, which permit the professor to waive procedural rights, voluntarily and knowingly. For example, the initial notice that non-retention is being considered may say that if the professor makes a written request, within a stated interval, a written statement of reasons will be supplied him, and that he will be provided with hearing at which he may respond; otherwise, he will simply be furnished with a letter announcing the decision without a statement of reasons. Also, even at the point at which a written statement of reasons is furnished, the professor may be advised that, if he makes a request for a hearing within a stated interval, a hearing will be scheduled; otherwise, the procedure will end with the written notice of non-retention and the reasons therefor.

3. It should clearly be understood that any more stringent requirements imposed by statute, custom, or otherwise, such as a showing of "cause" in the case of a tenured professor, are unaffected by this statement of minimal procedural requirements embodied in the due process clause of the Fourteenth Amendment.

public interest. *Pickering, supra,* at 570–571, 88 S.Ct. 1731. The defendants have not exhibited beyond dispute that such injury existed. It is not uncontroverted that the plaintiff's statements diminished his effectiveness in the classroom, hampered the administration's disciplinary actions, or furthered the disturbances and disorder already occurring on the campus.

Even if it were agreed that the plaintiff's utterances were inaccurate and unsound, it is clear from *Pickering* that a factual evaluation of their consequences would become necessary:

> "What we do have before us is a case in which a teacher has made erroneous public statements upon issues then currently the subject of public attention, which are critical of his ultimate employer but which are neither shown nor can be presumed to have in any way either impeded the teacher's proper performance of his daily duties in the classroom or to have interfered with the regular operation of the schools generally. In these circumstances we conclude that the interest of the school administration in limiting teachers' opportunities to contribute to public debate is not significantly greater than its interest in limiting a similar contribution by any member of the general public." 391 U.S., at 572, 88 S.Ct. at 1737.

■ Defendants argue that even if the statements of the plaintiff are constitutionally protected, section 2 of the Dean's report did not disapprove of them because they were critical of university administration, but only because they were unsubstantiated and evinced an unscholarly approach to the search for knowledge and truth. The plaintiff has alleged, and it is controverted, that the defendants relied on the public statements for more than the proposition that plaintiff was unscholarly. Plaintiff supports his argument with the contention that the defendants have presented no additional evidence which calls his competence into question. Further, he contends that the statements cited in the Darken memorandum are statements of opinion as to then existing conditions which cannot be subjected to the tests of scholarship. Factual error ordinarily affords no warrant for repressing speech otherwise free. New York Times Co. v. Sullivan, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964), motion for rehearing denied 376 U.S. 967, 84 S.Ct. 1130, 12 L.Ed.2d 83. Whether error is to be accorded special significance here will require an evaluation of the setting in which it occurred, if it was indeed error.

■ Defendants further contend that the defendant Guiles in making his decision of non-retention relied upon ample non-constitutionally protected activity as set forth in section one of Dean Darken's recommendation. This is put in dispute by the following allegations of the plaintiff:

> the defendant Guiles' decision of non-retention was based upon both sections one *and* two of Dean Darken's recommendation;

> even if the decision was based solely upon section one recommendations, the complaints there enumerated were only brought to light and used because of the plaintiff's criticism of university administration; and

> apart from the recommendation, defendant Guiles' decision was an attempt to retaliate against the plaintiff for his critical comments.

Both parties seem to agree that "a justifiable ground of discharge is not a defense when the" ground "is a *mere pretext* and not the moving cause of the discharge" (Defendants' Reply Brief in Support of Defendants' Motion, at p. 7; underlining in the original). The plaintiff has so alleged and should be allowed to attempt to prove it. Obviously, a non-retention decision based upon activity which is not constitutionally protect-

ed, is a valid decision. But a decision based in part on protected activity and in part upon unprotected activity is not a valid decision. In the present case it appears that a determination as to the actual bases of decision must await amplification of the facts at trial. Beilan v. Board of Education, 357 U.S. 399, 412, 78 S.Ct. 1317, 2 L.Ed.2d 1414 (1958) (Warren, C. J., dissenting). Summary judgment is inappropriate.

### Plaintiff's Motion for Partial Summary Judgment

There is a contrast between the relief sought in the complaint herein and the relief sought in the plaintiff's motion for partial summary judgment.

The allegations of the complaint embody an attack on the non-retention decision on both substantive and procedural grounds. The substantive grounds alleged are that the decision was based upon plaintiff's earlier expressions of opinion, and that there were no ascertainable and definite standards upon which the decision could be based.[4] The procedural grounds alleged are that the defendants refused to give reasons for their decision, and that they did not offer the plaintiff a hearing on the merits of the decision. The relief asked is a declaratory judgment with respect both to the substantive and procedural grounds, and an injunction requiring defendants to offer the plaintiff a contract for the 1969–1970 academic year.

The motion for a partial summary judgment, however, prays, apparently in the alternative: (a) that defendants either provide plaintiff with a hearing on the merits of his non-retention or offer

him a contract for 1969–1970; or (b) that defendants offer him a contract for 1969–1970 because the non-retention decision was not made on any ascertainable and definite standards. Thus the motion for summary judgment introduces a prayer for an order to compel defendants to provide procedural safeguards within the university.[5]

▆▆▆▆ Plaintiff might have elected to come here under 42 U.S.C. § 1983 and to seek only an order compelling defendants to offer him a contract for 1969–1970, alleging that the non-retention decision had actually been based on his exercise of First Amendment freedoms, and that there were no ascertainable rules and regulations of conduct governing faculty members upon which the non-retention decision could have been based. Had he done so, he would not have been required to exhaust whatever state administrative or judicial remedies might have been available to him. Damico v. California, 389 U.S. 416, 88 S.Ct. 526, 19 L.Ed.2d 647 (1967).

On the other hand, plaintiff might have elected to come here under 42 U.S. C. § 1983, allege that he had been given no reasons for his non-retention and had been afforded no hearing on the merits of the decision, and to seek only an order compelling the defendants to provide him with these procedural safeguards within the university.

▆▆▆▆▆ In this situation, I will consider first that alternative motion by the plaintiff for partial summary judgment in which he seeks an order compelling defendants to offer him a contract for 1969–1970 on the ground that the

4. Perhaps the contention concerning the absence of ascertainable and definite standards may be described as procedural rather than substantive. I understand the contention to be that there had not been made known to the plaintiff, in advance, rules and regulations sufficiently definite and specific to serve as a guide to conduct. I compare this with contentions

that substantive rules of conduct are vague or overbroad.

5. Since the complaint includes a prayer "for such other and further relief as may be equitable," the plaintiff is not foreclosed from seeking this specific relief in his motion for a partial summary judgment.

non-retention decision was not made on any ascertainable and definite standards. The motion must be denied. The contention appears to be that a non-tenured employee is constitutionally entitled to be told in advance that if he does not comply with certain reasonably specific standards of conduct, he will not be offered a contract for the following year. See Soglin v. Kauffman, 418 F.2d 164 (7th cir. 1969) (relating to students in a public university). The necessary implication is that if he does abide by these previously announced standards of conduct, he will be entitled to a contract for the following year. As I have explained above in discussing defendants' motion for summary judgment, it is important that in deciding whether to retain a non-tenured professor, the university should enjoy the widest possible latitude consistent with protection against arbitrariness and against invasion of his First Amendment rights. To accept the plaintiff's contention would be to erect a constitutional requirement even more severe than the showing of "cause" now required by Wisconsin law in the case of tenured professors. So far as the federal constitution is concerned—as distinguished from state statutes, regulations, collective bargaining agreements, or traditions—I have held that due process affords professors (tenured or non-tenured) protection only against non-retention based on their exercise of constitutional freedoms and against non-retention based on arbitrariness. To provide this limited protection it is not necessary to require that the university enunciate in advance a code of conduct for professors, violation of which will result in non-retention and compliance with which will result in retention.

This brings me to the remaining alternative motion by the plaintiff for a partial summary judgment: that defendants be compelled either to provide him with a hearing on the merits of his non-retention or to offer him a contract for 1969–1970. For reasons stated in my discussion of defendants' motion for summary judgment, I have concluded that this alternative motion must be granted, with modifications. That is, upon the facts not in dispute, I believe that as of January, 1969, the plaintiff was constitutionally entitled to be provided with a statement of the reasons why he was not to be retained for the year 1969–1970, to be given notice of a specific time and place for a hearing at which he could respond to the stated reasons, and to be given the hearing itself if he appeared at the stated time and place; in the absence of being provided these procedural safeguards, he was entitled to be retained in 1969–1970. Because of the passage of time while this action has been pending in this court, the relief must be modified somewhat, and the specific order of the court is as stated below.

Because the plaintiff is being furnished the procedural relief which he has sought in his motion for partial summary judgment, I stay further proceedings in this court on what appear to be the only remaining issues: whether in fact non-retention was based upon plaintiff's earlier expressions of opinion or was arbitrary. If the plaintiff is now furnished with a statement of the reasons for his non-retention, notice of an administrative hearing, and a hearing, I believe that the remaining issues in this case will have been clarified and that they will become more amenable to resolution.

*Order*

It is ordered that defendants' motion for summary judgment is hereby denied.

It is ordered that plaintiff's motion for a partial summary judgment that his rights were violated by defendants' decision not to retain him for the school year 1969–1970 because said decision was not made under ascertainable and definite standards, and for partial summary judgment that defendants be ordered to offer him a contract as a faculty member for the school year 1969–1970

(or any subsequent time), is hereby denied.

It is hereby ordered and adjudged that on or before March 20, 1970, the defendants herein are to cause to be delivered to counsel for the plaintiff herein a written statement of the reasons upon which the defendants relied in deciding not to offer plaintiff a contract for the 1969–1970 academic year; that on or before March 20, 1970, plaintiff's attorneys are to inform defendants' attorneys in writing of all dates after April 1, 1970, and prior to June 30, 1970, upon which plaintiff would be able to appear for a hearing in Oshkosh, Wisconsin; that on or before March 27, 1970, defendants are to cause to be delivered to counsel for the plaintiff herein a notice of a hearing at an appropriate place in Oshkosh, Wisconsin, on a date which is among those designated by the plaintiff and which is not less than ten days subsequent to the date on which notice is delivered to plaintiff's counsel; that said notice is to advise the plaintiff that at the specified place and time, he will be given an opportunity to respond to the reasons stated for his non-retention; that at the said time and place, if plaintiff appears, he will be given an opportunity to respond to the reasons stated for his non-retention; that within 15 days after the date of said hearing, the defendants will notify plaintiff's counsel herein either that he will not be offered a further contract with the university or that he is being offered a contract as a member of the faculty of the university for the academic year 1970–1971, on terms and conditions no less favorable to him than those contained in his contract for the academic year 1968–1969. It is hereby further ordered and adjudged that should the defendants elect not to comply with the immediately preceding order by providing the plaintiff with a statement of reasons for his non-retention, notice of hearing, and hearing, then the defendants shall be required, on or before June 1, 1970, to offer the plaintiff a contract as a member of the faculty of the university for the academic year 1970–1971, on terms and conditions no less favorable to him than those contained in his contract for the academic year 1968–1969.