EUGENE R. MCPHEE, Executive Director, Board of Regents of StateUniversities
There has been some confusion over your request, made on behalf of President Dreyfus, as to the legal implications involved in the establishment of a private (school) newspaper.
Apparently, the initial request was made on August 11, 1970, and involved four rather long and complicated questions concerning this general subject matter.
Your primary concern at this time relates to the third question of that request, and I will not now attempt to answer the other three questions. The question involved was stated as:
"(3) If a state university discontinued publication of the campus newspaper and then rented physical facilities to a private newspaper company, loaned the recognized name of the discontinued newspaper to that private company, purchased space in that private newspaper for advertisements, announcements. etc., and contracted to regularly purchase 10,000 copies of that private newspaper for subsequent free distribution, could the Board of Regents, the president, or the administration of that university be held legally responsible for any content of that private newspaper, outside of the space purchased by the university?"
The objective of the plan as envisioned by this question, as I understand it, is to have a campus newspaper published by a private nonprofit corporation, which corporation is legally isolated from the state. It follows from this objective that the private newspaper corporation may not be given preferential treatment if we hope to have the court sustain this relationship on the basis of contract rather than agency law.
Of course, if a private corporation is created, the relationship between that corporation and the state should be no different than the state's relationship with other private *Page 187 
corporations. In other words, all general laws relating to the use of state property, contracting, purchasing and what have you, as they generally apply to state business, funds and property, would be applicable to the newspaper corporation in question just as they are applicable to any private corporation.
USE OF STATE FACILITIES
As there does not appear to be any specific provision in ch. 37, Stats., relating to the use of school buildings or facilities, sec. 16.845, Stats., controls. This section states in part:
"Except as elsewhere expressly prohibited, the managing authority of any building or other facility owned by the state may permit the same to be used by any governmental body or official, any veterans' organization, or any nonprofit association for the purpose of governmental business, public meetings for the free discussion of public questions, or for civic, social, recreational or athletic activities. * * *"
It is doubtful, in my opinion, that this section intended to authorize the use of state facilities by a business corporation, even though nonprofit, for extended periods of time such as under a one-year lease. Nor do I find authority in ch. 37, Stats., that would clearly support a lease of school property to a private business corporation.
Even assuming, by a very liberal interpretation of sec. 16.845, Stats., that a day-to-day use of the facility is proper and allowable without the formality of a lease, the corporation would have to pay the reasonable and fair rental of such facilities. The private corporation should not be subsidized by the state, not only as a matter of law, but as a practical necessity to the maintenance of the basic concept of a truly private business corporation.
DISTRIBUTION TO STUDENT BODY
This question presupposes free distribution to the student body. Nothing is free, and I assume the school will purchase its 10,000 copies by the use of student activity fees. This *Page 188 
issue is bothersome for it raises the question as to the propriety of the board assessing the student body a fee which, even assuming, and we must make the assumption that state bidding laws will be strictly followed, is predestined as payment to this particular corporation. This is, in fact and law, a state subsidy of a private corporation for the corporation could not exist without this state commitment. It must not be forgotten that student activity fees are state funds and subject to appropriation by sec. 20.265, Stats., and in this situation are intended to be used for the purchase, not of a school paper but of a private newspaper. Whether this would be a legitimate expenditure of state funds could depend on the educational and general school purposes the paper will serve. The forced subscription of the student body to a particular private newspaper such as the New York Times, The Milwaukee Journal, or even the Capital Times, may serve some educational benefit upon which the purchase could be supported. However, the forced subscription of the student body to this particular newspaper can only be supported by speculation as to its educational benefits. Further, the paper may have little to do with the academic community except for the paid notices, announcements, etc., of the school that will appear in the paper, but will actually constitute a small part of the total publication.
The use of state funds for this purpose may be valid provided the board is able to determine a sufficient educational function is involved and reasonable controls are exercised by the board to insure that the funds are spent for this public interest, State ex rel. W. D. A. v. Dammann
(1938), 228 Wis. 147. However, the requirements of the Dammann case will place the state in the extremely awkward position of attempting to insure that state funds are used for a legitimate public purpose without exercising control over a private corporation in the sensitive area of the First Amendment. In my opinion, this is an almost impossible task.
 LIABILITY OF BOARD, SCHOOL ADMINISTRATORS, ETC.
This question cannot be answered because I do not have any facts as to what, if any, supervision or participation by *Page 189 
the faculty is anticipated. Certainly, if the private corporation is, in fact and law, a stranger to the Board, the school administration and the faculty, no liability could result to these parties.
 PURCHASE OF SPACE FOR NOTICES, ANNOUNCEMENTS, ETC. BY SCHOOL
At first blush, this issues does not seem to raise any insurmountable legal problems, and the purchase of space could, in my opinion, be accomplished under existing laws. A tedious explanation regarding the application of existing statutes at this time does not seem warranted.
THE CONCEPT GENERALLY
The general plan is open to serious question on numerous grounds, some of which have already been discussed. Whether the courts would consider the corporation as a separate legal entity from the state, considering the fact that it is run by students, housed in school facilities and subsidized by state funds, is open to very serious question. Courts generally give more weight to substance than form.
In Antonelli v. Hammond (1970), 308 F. Supp. 1329, the court was concerned with a campus newspaper that was not financially independent but was dependent on an allocation of funds derived from compulsory student activity fees. It is not clear whether the newspaper was a separate legal entity from the school but it apparently was treated somewhat as such. What is clear is that the school administration could not exercise censorship over the paper by virtue of its control over the purse strings.
What we have contemplated here is the creation of a private corporate entity which is nevertheless closely related to and dependent on state facilities and state support. Should the newspaper become objectionable because of what it prints, the question presented is whether the board could refuse to grant it space and funds in the future. Although there are no cases clearly or directly in point, it would, in my opinion, be a very close question as to whether the board could terminate the relationship on such grounds. The *Page 190 
obvious argument would be made that the state is infringing on free speech or freedom of the press by economic coercion. This argument would be given considerable weight under such decisions as the Antonelli case,Roth v. The Board of Regents (1970), 310 F. Supp. 972, and the case ofMcLaughlin v. Tilendis (1968), 398 F.2d 287.
RWW:CAB