**COOK COUNTY COLLEGE TEACHERS UNION, LOCAL 1600, AMERICAN FEDERATION OF TEACHERS, AFL–CIO, a voluntary association, et al., Plaintiffs-Appellants,**

v.

**Milton B. BYRD et al., Defendants-Appellees.**

**No. 18967.**

United States Court of Appeals, Seventh Circuit.

March 9, 1972.

John Henry Schlegel, Chicago, Ill., amicus curiae.

Gilbert A. Cornfield, Chicago, Ill., for plaintiffs-appellants; Kleiman, Cornfield & Feldman, Chicago, Ill., of counsel.

Albert E. Jenner, Jr., Chester T. Kamin, Chicago, Ill., for defendants-appellees.

Before FAIRCHILD, PELL and SPRECHER, Circuit Judges.

PELL, Circuit Judge.

This is an appeal from a judgment in a suit brought pursuant to 42 U.S.C. § 1983, concerning the nonrenewal of the teaching contracts of the two individual plaintiffs, Donald Paull and Ruth Nedelsky, formerly probationary faculty members at Chicago State College. The Cook County College Teachers Union, Local 1600, American Federation of Teachers, AFL–CIO (Union) joined in the action, purportedly on behalf of all the College's faculty. The defendants are officials at the College and the Board of Governors of State Colleges and Universities of Illinois, which by statute operates the College.

The amended complaint alleged that the defendants in denying Paull and Nedelsky teaching contracts for the 1970–71 academic year had violated their civil rights, their constitutional rights guaranteed by the first and fourteenth amendments, and "ancillary" guarantees of academic freedom incorporated into their teaching contracts. The complaint sought a declaration of the rights of the parties, injunctive relief and money damages.

More particularly, Paull and Nedelsky claimed that the defendants' failure to provide them with statements of the reasons for the nonrenewals violated their rights to procedural due process. In their briefs, but not in their complaint, they contend that they were also entitled to a hearing prior to their termination to respond to the reasons for the nonrenewal. The defendants allegedly violated the teachers' substantive constitutional rights by refusing to offer them contracts in retaliation for their union activities, their opposition to defendant Clark's reappointment to the chairmanship of the Department of Psychology, their public positions on racism in edu-

cational institutions and their opposition to the use of city police on the College's campus. In addition, plaintiff Paull alleged that he was not retained because of a letter he had written to the Illinois Psychological Association charging ethical violations in the use of student I.Q. scores by personnel employed by the Chicago Board of Education.

The defendants in their answer to the amended complaint denied, *inter alia,* that the Union was a proper class representative and admitted that the defendants had not told Paull and Nedelsky the reasons for the nonrenewal of their contracts.

In May 1970, the plaintiffs moved for a preliminary injunction allowing the terminated instructors to teach during the 1970–71 academic year pending a decision by the court whether their due process rights had been violated. Before the scheduled hearing on that motion, however, the plaintiffs moved for summary judgment on their claim that Paull and Nedelsky had been denied procedural due process. The district court then took the summary judgment motion under advisement and, *sua sponte,* struck from the call the hearing on the motion for preliminary injunction. In August 1970, the plaintiffs renewed their motion for preliminary injunction. On September 9, 1970, the district court scheduled a hearing on the motion for preliminary injunction. He also granted the defendants' motion to dismiss the class action and to strike the Union as a party plaintiff.

The parties stipulated that the record in the hearing on the motion for preliminary injunction would serve for disposition of the action on the merits. For four and one half days, the district court heard testimony and arguments about the procedures followed by the defendants in deciding not to renew the plaintiffs' contracts and the reasons for those decisions.

The court then found for the defendants, holding that the defendants had not acted on the basis of the constitu-

tionally improper reasons alleged in the amended complaint. It further concluded that the defendants had decided not to renew Paull's and Nedelsky's contracts in good faith and for constitutionally permissible reasons that were not wholly without basis in fact. Because the defendants at the hearing had explained the reasons for their decisions, the court held that no purpose would be served by returning the matter to the College for any further proceedings. Finally, the court decided that the pending motion for summary judgment was moot, denied the motion for preliminary injunction and dismissed the complaint.

The plaintiffs' appeal raises three issues: first, whether the district court erred in its determination that the action should not proceed as a class action; second, whether the district court clearly erred in finding that the defendants had acted in good faith and on the basis of constitutionally permissible reasons in deciding not to renew the plaintiffs' contracts; and third, whether, despite the holding of a full hearing in a federal district court on the reasons for the nonrenewals and the issuance of a judgment, the teachers were entitled to have their case referred back to the College for further proceedings.

I

The Union sued "on behalf of its class of members at Chicago State College and all of the faculty at Chicago State College." It did not sue individually in its own behalf. Paull and Nedelsky did not sue on behalf of a class. In support of the class action, the Union merely alleged that the claims of illegal action and the relief sought were of common interest to all faculty members.

Because the Union was a movant for summary judgment and both sides had submitted memoranda on that matter, the defendants wished the court to consider the propriety of the class action prior to its ruling on the plaintiffs' motion. Hence, pursuant to Rule 23(c)(1) of the Fed.R.Civ.P., they filed a motion,

accompanied by supporting affidavit and memorandum, to dismiss the class action and to dismiss the Union as a plaintiff. Rule 23(c) (1) states in part, "As soon as practicable after the commencement of an action brought as a class action, the court shall determine by order whether it is to be so maintained." One opposing a class action may move for an order determining that the action may not be maintained as a class suit. 3B J. Moore, Federal Practice ¶23.50, at 23–1102 (2d ed. 1969).

The Union contends that the district court should have held an evidentiary hearing on whether the Union was a proper representative. It is true that in doubtful cases a court may decide that such a hearing is necessary. The court here received three lengthy memoranda from the parties on the disputed issue whether the Union's purported class action met the requirements of Rule 23 and Rule 23.2. We find that the court did not err in proceeding as it did.

Rule 23(a), as amended in 1966, lists four prerequisites for a class suit.[1] The burden was on the Union, the party seeking to utilize the class action, to establish its right to do so. Philadelphia Electric Co. v. Anaconda American Brass Co., 43 F.R.D. 452, 457 (E.D.Pa.1968); 3B J. Moore, Federal Practice ¶23.02–2, at 23–156 (2d ed. 1969). It was obliged in its complaint to allege facts bringing the action within the appropriate requirements of the Rule. Gillibeau v. City of Richmond, 417 F.2d 426, 432 (9th Cir. 1969).

We agree with the defendants' contention that none of the prerequisites of Rule 23(a) are satisfied. The members of the purported class would seem to have interests antagonistic to those of their fellow "members" and to the Union's. We find it particularly significant that the Union is not recognized as the collective bargaining agent for any of the faculty. Further, apparently only a minority of the College's teachers are members of the Union and both tenured and probationary professors belong to the Union. According to an affidavit of the dean of faculty, only nine probationary faculty members' contracts were not renewed for the 1970–71 academic year. Thus, the class of teachers that is arguably valid is not too large to have made joinder impracticable.

The Union points to the declaratory and injunctive relief sought in the complaint and argues that because the "relief requested relates to each faculty member's rights guaranteed under the Constitution . . . [i]t would be ludicrous to suggest that the right to make such statements or take such action is not a matter which affects all faculty." We can agree that the resolution of constitutional issues in a case "affects" many persons. Indeed, perhaps all citizens, not just the Chicago State faculty, are "affected" by the suit. That does not mean, however, that that is the appropriate criterion for the propriety of a class action. In neither their memorandum nor their briefs do the plaintiffs cite persuasive authority to support their arguments that the class action is maintainable and the Union a proper plaintiff. The requisites of the Federal Rules of Civil Procedure must be met but supportive facts were not brought to the court's attention.

We agree with the district court's determination that the Union's class action

---

1. Rule 23(a) provides:
   "*Prerequisites to a Class Action.* One or more members of a class may sue or be sued as representative parties on behalf of all only if (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class."
   Even if an action meets the above four prerequisites, it must, of course, also fall within one of three subdivisions of Rule 23(b).

ion should be dismissed as a plaintiff.[2] cannot be maintained and that the Un-

## II

On the merits, the district court found that the defendants did not renew Paull's and Nedelsky's contracts for proper reasons and not the unlawful reasons asserted by the plaintiffs in their amended complaint.

The decision-making process at the College had operated as follows. The Board of Governors had delegated, subject to its review, the responsibility for personnel decisions to the president of the College (defendant Byrd), who, in turn, had primarily delegated his responsibility to the dean of faculty (defendant Suloway). The executive vice-president of the College (defendant Randolph) had reviewed the decision of the dean of faculty. The administrators had relied in part on the recommendation of the appropriate departmental chairman (in this case, defendant Clark of the psychology department). Although the tenured members of a department had voted on retention and tenure questions, their vote was advisory only, and the department chairman was required to make an independent evaluation as to whether a probationary faculty member's contract should be renewed. Thus, for the resolution of this case, the reasons of defendants Clark, Suloway, Randolph, and Byrd for their determinations about Paull and Nedelsky are crucial evidence.

The four individual defendants, all of whom appeared as witnesses, denied that retaliation for the plaintiffs' activities [3] was the basis for the nonrenewals and asserted that their judgments were unaffected by the plaintiffs' political and social beliefs. In addition to this denial each of these defendants testified as to the specific criteria or reasons he relied upon in making his recommendation.

Chairman Clark testified that evaluation of a teacher begins at the time of recruitment and occurs continuously thereafter. Clark had participated in the decision to hire Paull in the summer of 1967, but not in the decision to hire Nedelsky in 1965. He stated that in making his recommendations regarding the nonretention of the plaintiffs, he considered the following factors: (1) the assessments of the plaintiffs by other teachers in the department; (2) the plaintiffs' teaching ability; (3) their research work, including their interest in research and whether they gave professional papers; (4) the fulfillment of their obligations to the community; (5) their professional activities within the psychology department, including apparently how they interacted with their colleagues and with their students; and (6) the needs of the department and the College, not only at the present time but in the future too, because the College was undergoing expansion, and its needs were changing.

More particularly, Clark was concerned that the plaintiffs had received

2. The Union argued that it also qualified under Rule 23.2 of the Federal Rules of Civil Procedure. For the reasons set forth in the text, we find that the Union's reliance on Rule 23.2 is misplaced.

3. Evidence presented at the hearing clearly showed that Paull and Nedelsky had engaged in the following activities: (1) open support of the Cook County College Teachers Union's unsuccessful efforts to establish itself as a bargaining representative at the College, including participation in the abortive April 1968 teachers' strike; (2) opposition in spring 1969 to the reselection of defendant Clark to the

chairmanship of the psychology department and an attempt to have Paull, instead of Clark, receive the departmental recommendation for the position; (3) vocal disapproval of the presence of city police on campus during the "strike" by the College's black students in spring 1969; (4) written and oral discussion, particularly by Nedelsky, on racism in public education; and (5) the sending of a letter on College stationery by Paull in August 1968 to the Illinois Psychological Association suggesting that employees of the Chicago Board of Education breached professional ethics in their use of student I.Q. scores.

the recommendation of the tenured members of the department by a sharply split vote.[4] The closeness of this vote and certain personality traits of the plaintiffs, especially Paull, indicated that retention of the plaintiffs would not further Clark's goal of achieving a "harmonious" department.

Further, Clark was distressed that Nedelsky had not yet received her doctorate and that, even if she soon were awarded the Ph.D., it might not be in psychology. When questioned on cross-examination, Clark admitted that he had not checked with Nedelsky to confirm whether, in fact, her doctoral degree would not be in psychology or in a field of education related to psychology. He emphasized, however, that the school would, in the near future, need highly qualified teachers expert in laboratory work. The school's needs allegedly were not in the areas in which Nedelsky taught. In response to the plaintiffs' argument that retention for the 1970–71 academic year would not give Nedelsky or Paull tenure, Clark stressed that he felt it unfair to them to renew their contracts because of his "doubts" that they would ultimately receive tenure.[5]

The criteria that defendant Suloway, dean of faculty, testified he applied were similar to those of Clark. In addition, Suloway compared the plaintiffs' merits with the merits of those teachers "on board already, and with people with whom we have reason to believe we can employ to replace . . . [the teachers under discussion] in the event there is nonretention."

Suloway emphasized the importance of a teacher's participating "constructive-ly" in the activities of his department and in the operation of the College. One of the plaintiffs' witnesses stated that Suloway had informed the departmental APTS Committee that he had found Paull to be "abrasive" and "uncooperative." Further, Suloway had allegedly said that Paull's using College stationery for his letter to the Illinois Psychological Association was an "unsuitable action," a "manifestation of . . . [Paull's] mode of behavior." The dean had also told the APTS Committee that he felt Nedelsky was inflexible, particularly about agreeing to undertake activities that were not to her liking.

Defendant Clark testified that Suloway had also expressed concern whether Nedelsky had an adequate academic background in psychology. "He thought that we could do better."

Defendant Randolph assumed the executive vice-presidency of the College on July 1, 1969. He was not at the College at the time the events that plaintiffs alleged motivated the defendants to decide not to renew them occurred. He testified that he was unaware of the plaintiffs' activities prior to July 1969. The criteria that he claimed he had used in evaluating the plaintiffs were: (1) their academic preparation, the assessment of which involved a close reading of the plaintiffs' complete records; (2) the recommendations from the dean of faculty; (3) the present state of the psychology department, its plans, and the demands that would be made of it in the future; and (4) the state of the academic marketplace.

4. The eleven member "APTS Committee" (Appointments, Promotions, Tenure and Salary) of the psychology department voted 6 to 5 in favor of Paull's retention. It voted either 6 to 5 or 6 to 4, with one member abstaining, in favor of Nedelsky's retention.

5. Paull was in his third year at Chicago State when the decision was made that his contract would not be renewed for the next year. Nedelsky was in her fifth year. According to the bylaws of the Board of Governors, the decision whether tenure should be granted must be made no later than during the sixth year of a teacher's employment at the College. Dean Suloway testified that the College-wide "APTS Committee" adjures departments to make their decisions no later, whenever possible, than during a teacher's fifth year.

In regard to Paull, Randolph particularly noticed his failure, in over 15 years since he received his Ph.D., to make a significant scholarly contribution in the field of psychology. He noted, too, that, although Paull had taught at two other institutions, he had not been given tenure by them. Further, Paull was a clinical psychologist, and the College at that time did not offer a program in Paull's specialty. Randolph was also influenced by the closeness of the vote by the psychology department's APTS Committee. In sum, Randolph felt that Paull's record lacked distinction and that the current academic marketplace offered better possibilities for the College.

In regard to Nedelsky, Randolph was "shocked" that she had ever been hired by the College. "[S]he had . . . not a single degree in the field in which she was teaching. . . ."

Defendant Byrd, president of the College, testified that he had not played any part in the decisions resulting in the notification to Paull and Nedelsky in November 1969 that they would not be retained for the next academic year. However, he did review the decisions as a member of the Executive Council of the College Senate,[6] which held two meetings to review the Paull-Nedelsky matter.

President Byrd recalled that witnesses at those meetings offered the following evaluations of Paull: he operated his classes in such a way as to preclude investigation and expression of opinion by students; "there was a conclusion that he had a very undistinguished academic record and that the future would be more of the same"; he was abrasive, immature, uncooperative, and unable to accept decisions democratically arrived at by his colleagues—"he seemed to contribute to the intensification of what was already a polarized condition in the psychology department."

The comments about Nedelsky included: her teaching lacked intellectual content; she had "remarkably little background in her discipline"; she was abrasive, a polarizing influence in the department, and was unable to work with her colleagues; she was highly emotional and "unrealistic."

The discussions at the Council meetings led President Byrd to conclude that "there was an ample case made for the judgment of the Dean and the chairman." Voting by secret ballot, the Executive Council unanimously supported the administrative actions taken in regard to Paull and to Nedelsky.

We recognize that a justifiable ground of discharge is not a defense when that ground is a *mere pretext* and not the moving cause of the discharge. "Obviously, a nonretention decision based upon activity which is not constitutionally protected, is a valid decision. But a decision based in part on protected activity is not a valid decision." Roth v. Board of Regents of State Colleges, 310 F.Supp. 972, 981–982 (W.D.Wis.1970), aff'd, 446 F.2d 806 (7th Cir. 1971), cert. granted, 404 U.S. 909, 92 S.Ct. 227, 30 L.Ed.2d 181 (1971).

■ The plaintiffs' primary contentions are that the nonretentions really resulted from an anti-union bias on the part of the College administration and, in the case of Paull, also from retaliation for his writing the letter to the Illinois Psychological Association. The plaintiffs bore the burden of proof on these claims. The district court found, in effect, that the plaintiffs failed to satisfy their burden.[7]

---

6. The seven member Executive Council consisted of two administrators (President Byrd as chairman and Dean Suloway, appointed by Byrd) and five teachers elected by the Senate from among the Senate's members. The plaintiffs claim that the five faculty members were "Department Chairmen appointed by the administration and [were] avowed and open anti-unionists."

7. We are unable to say that an activating factor in the letter matter was the content of the utterances which might have

We appreciate how difficult it sometimes is to determine whether the reasons given by school authorities for the dismissal of a teacher are the actual bases for their decision. This is so in part because, as the district court in *Roth, supra*, 310 F.Supp. at 978–979, 983, remarked:

"[I]t is reasonable that there be available a very wide spectrum of reasons, some subtle and difficult to articulate and to demonstrate, for deciding not to retain a newcomer or one who had not yet won sufficient respect from his colleagues. . . . [I]t is important that . . . the university should enjoy the widest possible latitude consistent with protection against arbitrariness and against invasion of . . . [the teacher's] First Amendment rights."

On this appeal, we are bound by the "clearly erroneous" test of Rule 52(a), Fed.R.Civ.P. We find that the district court's determination that the defendants did not act from the motives alleged by the plaintiffs is not "clearly erroneous." Upon review of the entire evidence, we are not "left with the definite and firm conviction that a mistake has been committed." United States v. United States Gypsum Co., 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746 (1948).

██ The plaintiffs also presented evidence concerning their academic credentials. Such evidence may well be appropriate in a case like this, but the plaintiffs on appeal seem really to be urging this court to act as an appellate college committee with authority to order school officials to retain a nontenured teacher if he meets criteria established by us or

if he once was apparently regarded favorably by the College.[8] However, it is not our function to evaluate a professor's competence nor to determine whether he any longer fits the needs of a school that is expanding its programs and attempting to upgrade the quality of its faculty. We may not so far involve this court in the discretionary decisions made by state-controlled colleges. *Cf.* Judge Kiley's statement in his concurrence in Simcox v. Board of Ed. of Lockport Twp., 443 F.2d 40, 46 (7th Cir. 1971): "The defendant board members are selected by the residents of the community, and the community will get the school system that the members it elects provide."

██ Under *Roth*, the decision not to retain a nontenured professor employed by a state university is to be measured against a standard "considerably less severe than the standard of 'cause' as the latter has been applied to professors with tenure." *Roth, supra*, 310 F.Supp. at 979. More specifically, the appropriate standard for a district court to apply is that the decision "may not rest on a basis wholly unsupported in fact, or on a basis wholly without reason." *Id.*

The district court judge found that the defendants had applied "customary criteria." Courts in this circuit as well as in other circuits have concluded that reasons such as those advanced by the defendants in the instant case are constitutionally permissible. See, *e. g.*, Simcox v. Board of Ed. of Lockport Twp., 443 F.2d 40 (7th Cir. 1971); Knarr v. Board of School Trustees of Griffith, Ind., 452 F.2d 649 (7th Cir.

raised a question of constitutional protection. The use of official stationery for the expression of personal views appears to have been the critical factor. At least one defendant thought it was a further example of Paull's lack of judgment.

8. The plaintiffs apparently assume that a favorable recommendation by a teacher's

peers or by the administration one year forecloses reexamination of the teacher's merits in subsequent years. Or, if a reevaluation is made and that assessment is less favorable than the previous assessment, then prejudicial influences must have affected the later decision. Testimony revealed, however, that the faculty is constantly reevaluated. Indeed, ten-

1971); Fluker v. Alabama State Bd. of Ed., 441 F.2d 201 (5th Cir. 1971); Robbins v. Board of Ed. of Argo Comm. H. S., 313 F.Supp. 642 (N.D.Ill.1970); Albaum v. Carey, 310 F.Supp. 594 (E.D. N.Y.1969).

The district court found that the "defendants were credible witnesses." The record as a whole supports the district court's determination that the actions of the College administrators did not rest "on a basis wholly unsupported in fact, or . . . wholly without reason." [9]

## III

The district court conducted the hearing in this case in September 1970. This court decided *Roth, supra,* on July 1, 1971. In our opinion, the most sensible and economical course is that those cases, such as the present one, which were the subjects of full hearings in district courts before July 1, 1971, should not be sent back to the schools for further action. Evidentiary proceedings in the district courts in these pre-*Roth* situations sufficiently protect the rights granted public school teachers by *Roth*. *Cf.* Jennings v. Mahoney, 404 U.S. 25, 92 S.Ct. 180, 30 L.Ed.2d 146 (1971); Fluker v. Alabama State Bd. of Ed., 441 F.2d 201, 208 and n. 15 (5th Cir. 1971).

What we have said here, of course, would have no application to cases before district courts in the post-*Roth* (July 1, 1971) situation.

For the reasons hereinbefore set out, the judgment of the district court is affirmed.

Affirmed.

---

ured teachers as well as nontenured teachers are rated yearly. Salary increments depend on this rating.

We note that in the case of Nedelsky, although she had received the recommendation of her peers for the two years prior to the year in question, the vote in her favor decreased each year.

9. *Cf.* Simcox v. Board of Ed. of Lockport Twp., 443 F.2d 40, 42 (7th Cir. 1971), decided prior to our decision in *Roth*:

"Our only province, as respects the reasons given by the Board for plaintiff's dismissal, is to determine whether such reasons are so wanting in evidentiary support that it must be said that they are in effect, a smoke screen hiding some undisclosed reason which was the real basis for defendants' action. . . ."