**Vivian VOLK, Plaintiff,**

v.

**Gregory COLER, et al., Defendants.**

**No. 81–3366.**

United States District Court,
C.D. Illinois,
Springfield Division.

July 8, 1986.

---

Patricia C. Benassi, Peoria, Ill., for plaintiff.

Barbara J. Collins, Christina M. Saunderson, Asst. Attys. Gen., Springfield, Ill., for defendants.

## OPINION AND ORDER

MILLS, District Judge:

Directed verdicts.

As to the State Director, the Regional Director, equal protection and due process claims—ALLOWED.

As to the First Amendment and retaliative claims against the remaining Defendants—DENIED.

Ms. Volk brought this cause of action alleging that six employees of the Department of Children and Family Services (DCFS) acted and conspired to deny her employment and to wrongfully transfer her because of her sex, and because of her opposition to sexual harassment. Suit was filed pursuant to a number of civil rights statutes, including 42 U.S.C. §§ 1983 and 1985 and 42 U.S.C. § 2000e *et seq.* On May 12, 1986, trial by jury was held simultaneously with those issues arising under Title VII of the Civil Rights Act, which are triable by bench.

Prior to trial, the Court denied Defendants' joint motions for summary judgment on the ground that Plaintiff's allegations, if supported by the evidence, might establish liability under the civil rights statutes. In a subsequent ruling on the parties' cross-motions *in limine*, however, the Court expressed to counsel its concern about the extent of personal involvement of certain Defendants named in this lawsuit, such involvement being a necessary element of Plaintiff's proof.

At the close of Plaintiff's case, the Court reserved ruling on Defendants' motion for a directed verdict. At the close of all the evidence, however, the Court directed a verdict in favor of two of the six Defendants on the ground that Plaintiff had manifestly failed to carry her burden of persuasion with respect to these Defendants on the crucial elements of their personal involvement in the claimed deprivations of Plaintiff's rights, as well as intent and causation; and further, that no reasonable juror could find them so involved under the governing legal standards in this circuit. In addition, this Court directed a verdict in favor of all Defendants on the claimed violations of Plaintiff's rights in violation of the due process and equal protection clauses of the Fourteenth Amendment (brought under § 1983), and on the alleged conspiracy to deprive Plaintiff of the equal protection of the laws (brought under § 1985). Left for the jury's consideration was the sole issue of whether any of the Defendants retaliated against the Plaintiff in response to her exercise of her First Amendment right to protest what she felt was unlawful discrimination.

This order constitutes a final ruling on Defendants' motion for a directed verdict.

### Directed Verdict Standard

The standard for entering a directed verdict and a judgment notwithstanding the jury's verdict is the same. *See Sparrow v. Yellow Cab Co.,* 273 F.2d 1 (7th Cir.1960); *Shaw v. Edward Hines Lumber Co.,* 249 F.2d 434 (7th Cir.1957). In considering such motions, the Court must determine "whether the evidence presented, combined with all reasonable inferences permissably drawn therefrom, is sufficient to support the verdict when viewed in a light most favorable to the party against whom the motion is directed." *Tice v. Lampert*

*Yards, Inc.,* 761 F.2d 1210, 1213 (7th Cir. 1985).

The Court should not make credibility determinations. *Brady v. Southern Railroad,* 320 U.S. 476, 64 S.Ct. 232, 88 L.Ed. 239 (1943); *Sonnentheil v. Christian Moerlein Brewing Co.,* 172 U.S. 401, 408, 19 S.Ct. 233, 235, 43 L.Ed. 492 (1899). Only the non-moving party's evidence and the moving party's uncontradicted and unimpeached evidence should be considered. *Panter v. Marshall Field & Co.,* 646 F.2d 271 (7th Cir.), *cert. denied,* 454 U.S. 1092, 102 S.Ct. 658, 70 L.Ed.2d 631 (1981), citing *Brunner v. Minneapolis, St. Paul & Sault Ste. Marie Railroad,* 240 F.2d 608 (7th Cir.1957); *see also C.A. Wright and A.R. Miller,* Federal Practice and Procedure: Civil § 2524, p. 573 (1971).

### Facts

In accordance with these guiding principles, the Court accepts as established the following relevant evidence offered or unchallenged by Plaintiff:

Prior to the incidents giving rise to her discrimination claims, Ms. Volk was employed as a child abuse outreach worker by Covenant Counseling Services, which was housed in the Ottawa field office of the DCFS pursuant to a contract between the two agencies.

Defendant James Tapen was the supervisor of the Ottawa field office and allegedly sexually harassed Plaintiff. He was in charge of hiring someone for the position of Social Worker I with DCFS. Mr. Tapen allegedly made verbal threats to Ms. Volk and turned her down twice for the position and also had her prematurely transferred from the Ottawa field office. Defendant Martin Lohman was Tapen's immediate supervisor. Defendant Jessie Hairston was the regional administrator of the Peoria region and supervised both Tapen and Lohman until March 17, 1980, when she became ill. Defendant Tom Ward took over her duties in her absence until she returned in May. After Hairston's return, she and Ward shared the duties of regional administrator until Hairston resigned in August or September. Defendant Jesse Viers was the labor relations specialist in the Peoria region assigned to handle Plaintiff's grievances. Defendant Gregory Coler was the Director of the DCFS.

According to Ms. Volk, Tapen began sexually harassing her almost immediately after she began working in the Ottawa field office in November, 1978. After Tapen learned that Ms. Volk would not respond to his sexual advances, Tapen allegedly became critical and disparaging of her work and told her that her co-workers were complaining about her and said she should be "nicer" to everyone. When Plaintiff asked her co-workers if they had any complaints, they denied it. Tapen then admitted that the criticisms were "just my own personal feelings." Tapen also began making unfounded criticisms of her work and took various steps to prevent Plaintiff from effectively performing her duties. For example, when Plaintiff used what she felt were acknowledged social work practices to work with abused women, Tapen accused Plaintiff of teaching the abused women more of her "women's lib bullshit." Tapen repeatedly made disparaging remarks about women, implying that their problems would be solved by having sex.

In December 1979, a Social Worker I position became open in the Ottawa field office. No state employees bid on the job during the applicable time period. Plaintiff was the only bidder and was on the "A" list.

On January 2 and 3, 1980, Plaintiff was interviewed by Tapen for the position. Plaintiff was the only candidate for the position to receive an A on the competitive examination and was a well-qualified applicant who had job experience directly related to the job.

During the interview, Tapen initially asked Plaintiff a series of job-related questions which Plaintiff answered to Tapen's satisfaction. Tapen also told Plaintiff she was a good and a hard worker. Defendant Tapen informed Plaintiff that he was considering hiring a state employee trainee

employed in the Princeton DCFS office but was checking into the legality of so doing. When Plaintiff asked why he did not want to hire her, he told her that he had concerns about what she did after hours, and he complained that she had not attended a co-worker's Christmas party and that her roommate failed to invite various office members to a gathering in their home. He also told her she should go back to her husband and asked how her children felt about her divorce. When Plaintiff protested saying he was using things in her personal life against her, he responded, "Yes, that's true."

Mr. Tapen, on the other hand, denies that he based his decision on impermissible considerations. Rather, he states that DCFS policy provides that if less than three candidates are available for selection, then management is not required to select from two or less candidates. He therefore claims that he was merely attempting to insure that he had available a well-qualified pool of applicants to choose from.

After the interview, Tapen rejected Plaintiff for the Social Worker I position and selected the trainee. Plaintiff also testified that Tapen consulted with Defendant Hairston before hiring the trainee, who approved his choice. A few days later Mary Wegrzyn, a co-worker of Plaintiff's, advised Hairston of Tapen's illegal motivations and actions in refusing to select Plaintiff. Notwithstanding, Hairston allegedly continued to approve Tapen's actions.

On January 9, 1980, Plaintiff filed a written grievance in which she protested Tapen's refusal to hire her claiming that his actions were discriminatory and violated the Department of Personnel Rules in numerous ways. Defendant Lohman, Tapen's direct supervisor, was in the office with Tapen when Plaintiff presented her first grievance to Tapen.

Tapen denied Plaintiff's grievance which was then submitted to the regional administrator, Jessie Hairston. Hairston, Viers and Lohman were responsible for reviewing and correcting Tapen's actions at the regional level and had numerous consultations about the action to take with respect to Plaintiff and Tapen's refusal to hire her.

On January 25, 1980, Viers sent a copy of Plaintiff's grievance to the DCFS labor relations office in Springfield, Illinois. John Henderson was the labor relations contact person in Director Coler's office and worked pursuant to his direction and authority. Henderson reviewed the grievance and made notes in the margin noting that with respect to Tapen's questioning and refusal to hire Plaintiff because of non-merit reason, these were "hard to defend" and made other criticisms of Tapen's actions.

On January 28, 1980, Viers met with Tapen and Plaintiff as well as her representative, another co-worker, at the second level of the grievance proceeding. The purpose of this meeting was to give the regional management, which included Viers, Lohman and Hairston, the opportunity to review Tapen's decision in refusing to hire Plaintiff and decide whether to uphold it or change it. Plaintiff orally presented the facts surrounding Tapen's refusal to hire her. She advised Viers of Tapen's illegal consideration of non-merit factors in connection with her employment, his discriminatory treatment against her and the putative violation of the personnel rules by selecting the ineligible trainee. Viers made a written record of what occurred including the statements made to her by Tapen. After the meeting, Viers submitted his written report to Defendants Hairston and Lohman and to John Henderson.

On January 31, 1980, Jan van Blommesteyn, chief of labor relations at the DCFS who reported directly to Director Coler, sent a memo to Defendant Hairston asking that Viers speak to Tapen about the issue in the grievance and advising Hairston that *"the grievance as written is something we should all be very concerned about."* On February 6, 1980, Plaintiff personally sent a copy of her grievance to Director Coler requesting that he take corrective action.

On February 15, 1980, the trainee selected by Tapen withdrew her application for employment. Tapen, however, continued

to look for other applicants. His request for another list of applicants was allegedly approved by Defendants Hairston, Lohman and Viers. On the same day, Hairston, pursuant to the recommendation of Viers and with approval of Lohman, denied Plaintiff's grievance.

Thereafter, Plaintiff retained legal counsel and appealed her grievance to Director Coler. On March 10, 1980, Plaintiff's counsel notified a DCFS labor relations person, John Henderson, about Tapen's sexual harassment and retaliation against Plaintiff and informed him that Plaintiff would be filing sex discrimination charges with the Fair Employment Practices Commission and the Equal Employment Opportunity Commission if Tapen continued to deny her employment. Henderson immediately called Viers and notified him of Plaintiff's intentions. Viers notified Tapen of Plaintiff's allegations and intentions to file sex discrimination charges and inquired of Tapen what the basis of the sexual harassment allegations could be. Tapen informed Viers of possible conduct of his which Plaintiff could allege, specifically mentioning the incident on the dance floor in Princeton, his reference to women as "honey" or "babe" and his putting his arms around females under his supervision. Viers reported this information back to Henderson. On March 11, 1980, John Henderson wrote to Hairston and advised her that Plaintiff was claiming that Tapen had made sexual advances towards her which she had rejected which was a motive for Tapen's refusal to select her for employment. Hairston was also advised that Plaintiff was considering filing sex discrimination charges if the matter could not be resolved. Henderson advised Hairston that "because of the sensitive nature of this grievance, all documentation available is critical in supporting management's decision not to select this candidate." Tapen as well as DCFS legal counsel and Deputy Director Gordon Johnson who reported directly to Director Coler also received copies of this memorandum. Lohman and Viers were also notified of Plaintiff's intentions. In addition, Tapen was informed that Plaintiff's allegations were being seriously investigated by Coler's office.

On March 25, 1980, Tapen informed Plaintiff that she was being removed from the Ottawa field office. Lohman agreed with him and approved his action knowing of Plaintiff's claim and either Hairston or Ward also approved the action.

On March 27, 1980, a third level grievance hearing was held. Plaintiff was present and present to represent management were Tapen, Viers, Lohman and Henderson. During this meeting, Tapen admitted that Plaintiff was a good worker and that she was qualified for the job. He admitted that he had informed Plaintiff he did not want to hire her because she had not attended an after-hours Christmas party at a co-worker's home and because she had not invited co-workers to her home for a party. He admitted questioning her about her divorce, telling her that she should return to her husband, and questioning her about her children. Tapen did, however, raise other reasons for his refusal to hire Plaintiff. Tapen's statements were all made in the presence of Viers and Lohman as well as John Henderson, Director Coler's labor relations representative.

Thereafter, Henderson drafted a written summary of the third level meeting setting forth substantially all of Tapen's statements and admissions. The written summary was given to Coler, Lohman and Ward.

On April 2, 1980, Plaintiff's attorney wrote to Director Coler directly and informed him of Tapen's retaliatory actions against Plaintiff. Coler received the correspondence on April 7, 1980. Plaintiff's attorney also sent Coler a statement in support of Plaintiff's grievance which set forth all of the facts in support of Plaintiff's claim including the violations of Department of Personnel Rules and Regulations and the state and federal laws which had been violated. Plaintiff's attorney informed Coler that Tapen was incapable of making an objective decision regarding Plaintiff's application for the Social Worker

I position and requested him to prevent any further retaliation by Tapen against Plaintiff by preventing the transfer of Plaintiff from the Ottawa field office and giving someone else authority to determine whether or not Plaintiff would be hired. The other Defendants were also informed of Tapen's alleged retaliatory actions towards Plaintiff.

On April 3, 1980, Jan van Blommesteyn, chief labor relations expert, sent a copy of a memorandum to Coler advising of Tapen's threats and retaliatory action against Plaintiff and stating that if the accounts were true, Tapen was "demonstrating improper conduct and possibly unprofessional behavior". Van Blommesteyn further advised that "the fact we have a potential sexual discrimination suit being considered causes serious concern on my part."

On April 10, 1980, van Blommesteyn sent Director Coler a copy of the written summary and recommendation made by John Henderson from the third level grievance meeting to Plaintiff's grievance along with another document. The written account of the third level grievance meeting contained all of Tapen's statements as well as Plaintiff's allegations. Van Blommesteyn informed Coler in an accompanying letter, "Because of the sensitive nature of these two grievances, I am sending the proposed third level response to your office for review."

On April 10, 1980, Coler sent a copy of the decision to Plaintiff's attorney with a letter that stated, "I have reviewed the attached summary of the third level meeting, and I concur with the recommendations therein." The recommendation denied Plaintiff's grievance in its entirety.

On April 23, 1980, Coler wrote to Plaintiff's attorney regarding her April 2, 1980, letter concerning Tapen's threats and retaliatory action against Plaintiff. Coler in his letter stated "I am having the matter researched ... Upon completion of our review of the information secured, I will provide you with further response to this matter." No response to Plaintiff's April 2, 1980, letter was ever received.

In late April or early May, Tapen again interviewed Plaintiff for the Social Worker I position, but hired a black male applicant. The male applicant had received a "C" on the competitive examination and had no DCFS experience. Plaintiff, by comparison, had received an "A" on the competitive examination and had 17 months of experience in the Ottawa field office.

Before Tapen selected the male applicant, he arranged for him to meet with his supervisor, Lohman. After the interview, Lohman approved the hiring of the male applicant as did Ward, Lohman's immediate supervisor.

In May 1980, Plaintiff submitted another written grievance protesting Tapen's second refusal to hire her as well as her removal from the Ottawa field office in April 1980. Plaintiff set forth the facts in support of her grievance and specifically compared her qualifications to those of the male applicant. She described the threats and other retaliations taken by Tapen against her. Tapen refused to discuss the grievance at the first level. Ward denied the grievance at the second level. Viers, Lohman and Ward again approved and ratified Tapen's hiring of the male applicant.

In August 1980, a hearing was scheduled by the Department of Personnel in accordance with the Department of Personnel grievance procedure. The hearing, however, never took place.

### The "Personal Involvement" Requirement

In order to establish liability under 42 U.S.C. § 1983, a plaintiff must allege with clarity and prove by a preponderance of the evidence (1) that "the conduct complained of was committed by a person acting under color of state law, and (2) [that] this conduct deprived a person of rights, privileges, or immunities secured by the Constitution or laws of the United States." *Parratt v. Taylor,* 451 U.S. 527, 535, 101 S.Ct. 1908, 1913, 68 L.Ed.2d 420 (1981); *see e.g. Coleman v. Frantz,* 754 F.2d 719, 722 (7th Cir.1985).

The parties do not dispute that all of the Defendants are state employees who conduct themselves under color of state law. See generally, *Drollinger v. Milligan,* 552 F.2d 1220 (7th Cir.1977). To establish liability, however, the Plaintiff must also show that each Defendant "committed" the conduct of which she complains. The doctrine of *respondeat superior* does not apply; absent personal involvement in the alleged constitutional deprivation, no liability will attach. *Crowder v. Lash,* 687 F.2d 996 (7th Cir.1982). *Wolf-Lillie v. Sonquist,* 699 F.2d 864, 869 (7th Cir.1983).

In essence, this standard requires proof of *causation, i.e.* that the individual Defendant actually caused the Plaintiff's injury *through his own conduct* (or misconduct). As this Court has previously held in *VanHoudnos v. Evans, et al.,* 627 F.Supp. 476, 479 (C.D.Ill.1986), "[t]he second branch of the proof of a claim under § 1983 implicates the concepts of causation and mental state grafted from the common law." In this circuit, the causation element of § 1983 requires the plaintiff to establish that the deprivation of his constitutional rights would not have occurred *"but for"* the defendant's conduct. *Lossman v. Pekarske,* 707 F.2d 288, 291 (7th Cir.1983). *Cf. Taliferro v. Augle,* 757 F.2d 157, 161–62 (7th Cir.1985) (dealing primarily with damages).

In determining whether the Defendants' own actions or inactions in the instant case can be said to have caused the claimed deprivation of Plaintiff's rights, the Court in *Crowder v. Lash, supra,* noted that a defendant's direct participation in the deprivation is not required. 687 F.2d at 1005. Rather, "[a]n official satisfies the personal responsibility requirement of section 1983 if she acts or fails to act with a deliberate or reckless disregard of plaintiff's constitutional rights, or if the conduct causing the constitutional deprivation *occurs at her direction or with her knowledge and consent." Id.* (emphasis added). *See also Smith v. Rowe,* 761 F.2d 360, 369 (7th Cir.1985). Thus, in order for a supervisory official to be found liable there must be "[a] causal connection, or an affirmative

link, between the misconduct complained of and the official sued ..." *Wolf-Lillie,* 699 F.2d at 869 (*citing Rizzo v. Goode,* 423 U.S. 362, 371, 96 S.Ct. 598, 604, 46 L.Ed.2d 561 (1976)).

### State Director Coler

Applying these concepts of causation and personal involvement to this case, we begin with Defendant Coler, the Director of DCFS during the time periods in question and the highest level official in the agency's chain of command. At trial, Mr. Coler testified that as head of the DCFS (which employes over 2,000 people) he is only indirectly a supervisor of the agency's employees and does not handle employee complaints. Such complaints and grievances are instead delegated to the Office of Employee and Labor Relations. Mr. Coler also testified that although the third level hearings of employee grievances were technically supposed to be presented to him, those hearings were in fact handled by the labor relations department. According to Mr. Coler, his sole function was to "sign off" the necessary documents. Coler also admitted having received letters from Plaintiff's attorney, but again these were referred to labor relations for investigation and further action.

Despite the lack of evidence that Coler was actually involved with Plaintiff's grievance, Plaintiff, citing *Smith v. Rowe,* 761 F.2d 360 (7th Cir.1985), contends that Coler's actual knowledge of Plaintiff's complaints and his failure to take corrective action satisfies the personal involvement requirement of § 1983. Although there is language in *Smith* that supports this view, the facts in *Smith* and the great weight of legal authority to the contrary do not support Plaintiff's position.

In *Smith,* a prison inmate sued, among others, the head of the Illinois Department of Corrections (Rowe) for excessive punishment for Plaintiff's refusal to do a work assignment. Rowe moved for a JNOV, arguing that Plaintiff had failed to show his personal involvement in the constitu-

tional deprivations. Finding that there was "an affirmative link between the misconduct complained of and the official sued" in that case, the Court noted that:

The chief civilian librarian of the law library wrote to Rowe informing him of Smith's case in great detail and urged that he intervene to remedy Smith's mistreatment. Rowe did nothing. United States Congressman Ralph H. Metcalf wrote to Rowe asking him to intervene. Rowe wrote a detailed response which revealed an intimate knowledge of the case. In the letter he ratified and adopted the actions of his subordinates.

Rowe testified in a deposition that he had discussed Smith's situation with Warden Sutliff-Nesbitt on a number of occasions. Warden Sutliff-Nesbitt indicated that she did not intend to reassign Smith to the law library. Rowe concurred each time in the warden's intended actions. Rowe also admitted that refusal of a work assignment was a relatively minor offense which usually carried a maximum sentence of 15 days of segregation.

*Id.* at 369. On the basis of these indications that Rowe was in fact personally involved in the claimed constitutional deprivations, the Court held that "Rowe *knew of the actions of his subordinates* which resulted in a constitutional violation. Also, [Rowe] *failed to take any preventive action.* We are satisfied that there is the requisite affirmative link between Rowe and Smith's segregation." *Id.* (emphasis added).

The *Smith* case is clearly factually distinguishable from the case *sub judice.* The detailed knowledge of and actual involvement Rowe had in Smith's case, and the nature of the constitutional deprivation in that case justified the inference that Rowe's failure to intervene was in "reckless disregard for Plaintiff's constitutional rights." *Crowder,* 687 F.2d at 1005. By contrast, the only reasonable inference from the facts of this case is that Coler only generally had some knowledge of Plaintiff's complaints. Further, Coler took some action when he referred Plaintiff's letters to the labor relations department for investigation; actions which cannot be considered in reckless disregard of Plaintiff's rights.

Further, despite the fairly broad language of the *Smith* decision, another recent case, *Soderbeck v. Burnett County, Wisconsin,* 752 F.2d 285 (7th Cir.1985), indicates that the failure to take corrective action *in and of itself* cannot violate § 1983. In *Soderbeck,* Plaintiff brought suit under § 1983 alleging that she had been fired from her job at the sheriff's office for political reasons. The district court entered a judgment against the sheriff and the county but directed a verdict in favor of three members of the county's law enforcement committee which heard Plaintiff's appeal of her firing. The Seventh Circuit reversed, ordering a retrial against the three committee members. The Court initially noted that "if all Nelson [a committee member] had done was to relay to Mrs. Soderbeck Kellberg's decision, taken without consultation with Nelson, to hire her, and if all the committee had done was to turn down her appeal, the members of the committee ... would not be liable under section 1983." *Id.* at 293. The rationale for this ruling was that the "[f]ailure to take corrective action cannot in and of itself violate section 1983." *Id.* Otherwise, the Court explained:

the action of an inferior officer would automatically be attributed up the line to his highest superior and thence to the local government, since the misconduct of policy-making officials (here the members of the Law Enforcement Committee) is attributed to the government. *This ladder of liability would be inconsistent with the distinction created by Monell between the direct and derivative liability of local government, and with the many lower-court cases that reject the notion that supervisors are strictly liable for their subordinates' violations of section 1983.* See, e.g., *Schultz v. Baumgart,* 738 F.2d 231, 238–39 (7th Cir.1984); *Wolf-Lillie v. Sonquist,* 699 F.2d 864, 869 (7th Cir.1983).

In *Soderbeck*, however, the Court held that there remained material factual disputes as to whether the committee actually participated in the firing by approving it. In that case, there was evidence that the committee had initially hired Mrs. Soderbeck, had been involved in another disciplinary matter in the sheriff's department and met regularly with the sheriff. Thus, there was an indication that the committee "may actually have approved rather than merely refused to annul the firing of Mrs. Soderbeck ... [thus allowing] a reasonable jury to infer that the committee (Nelson in particular) participated in—at least by ratifying, but in any event not just by passively refusing to intervene in—Kellberg's firing of Mrs. Soderbeck." *Id.* at 294.

Similar language is found in *Crowder v. Lash, supra,* where a Commissioner of Corrections was held *not* personally responsible for an inmate's constitutional deprivations even though the commissioner was shown to be familiar (through communications with his subordinates and through letters from the inmate) with the conditions in D.O. seclusion. The Court explained that the "logical import of the Plaintiff's theory would be to hold any well informed Commissioner of Corrections personally liable for damages flowing from *any* constitutional violation occurring at *any* jail within that Commissioner's jurisdiction. We believe that such a broad theory of liability is inconsistent with the personal responsibility requirement for assessing damages against public officials in a section 1983 action." *Id.* at 1006. The *Crowder* court, however, also held that the district court erred in directing verdicts in favor of members of the prison's disciplinary committee, who "participated directly in the 'disciplinary hearings' by which Crowder was repeatedly sentenced to confinement in the D.O. seclusion ward." *Id.*

■ In accordance with these standards, and viewing the reasonable inferences therefrom in the light most favorable to the Plaintiff, the Court finds that no reasonable jury could infer that Director Coler was personally involved in the claimed dep-

rivations of Plaintiff's rights to such an extent that it could be concluded that there was "an affirmative link" between Coler's action (or inaction) and the claimed deprivations. Director Coler simply had no direct involvement in the grievance process to which Plaintiff objects, nor did he become personally involved in investigating Plaintiff's complaint. The Plaintiff cannot attach liability to him simply by sending him letters complaining of the putative discrimination. Further, the Director's expressions of assurance that her charges would be investigated do not impose a duty on him to personally investigate. Director Coler fulfilled his duty by ordering the office of labor relations to investigate the charges.

The evidence clearly shows that the grievance procedure itself was designed to allow the Director to delegate personnel problems to the labor relations department, and there was no evidence that he involved himself in Plaintiff's case outside this process. Director Coler's only participation in the entire grievance process was to assure the establishment of a structural review process and to approve the final decisions of the grievance committee. In almost every organization, these kinds of decisions eventually require final approval by the head of the organization; such events, however, cannot alone form the basis for § 1983 liability. These facts preclude any conclusion that the Director was personally involved in the claimed deprivations of Plaintiff's rights, or that he "caused" such deprivations.

Even under a lenient standard of causation, and more clearly under a strict "but for" test, Plaintiff's proof does not establish the critical elements of causation and personal involvement with respect to Coler. We cannot accept the theory that the most general knowledge of an employee's complaint can render a state official personally responsible if those complaints turn out to be true. If this were the case, an aggrieved employee could force every high-level official to defend against a lawsuit merely by sending him a letter of complaint. As noted in *Crowder*, the "logical import of

Plaintiff's theory would be to hold any well informed [director] personally liable for damages flowing from *any* constitutional violation [occurring within his agency]." Such a broad theory of liability would clearly be inconsistent with the "personal involvement" requirement of § 1983, and the Supreme Court's decision in *Monell v. Dept. of Social Services*, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978).

*Ergo*, the Court directs a verdict in favor of Defendant Coler and against Plaintiff on all issues arising under 42 U.S.C. § 1983.

### Regional Director Hairston

█ Ms. Hairston, as regional director of the DCFS, would ordinarily have more personal involvement in the grievance process itself than the Director. However, Ms. Hairston's absence during much of the time the alleged acts occurred, as well as her lack of direct involvement in Plaintiff's grievance, precludes the conclusion that she was personally involved in the claimed deprivations of Plaintiff's rights.

As regional administrator of the Peoria region of the DCFS, Ms. Hairston was the supervisor of Ms. Viers, the labor relations specialist who was directly involved in handling Plaintiff's grievance. Ms. Hairston took a leave of absence in March of 1980 and did not return until May. It was during this time—with Defendant Ward acting as regional administrator—that much of the correspondence concerning Plaintiff's grievance was being circulated.

It is true that prior to leaving Ms. Hairston did receive some correspondence from Ms. Viers concerning Plaintiff's grievance. As with Director Coler, however, her sole function *at that time* was to insure that Ms. Viers was investigating the charges. This is precisely what Ms. Hairston did; her actions prior to her departure in March cannot be said to have been in "reckless disregard" for Plaintiff's constitutional rights. And as with Director Coler, her mere knowledge of Plaintiff's complaints, without more, does not satisfy Plaintiff's burden of establishing the critical elements of causation and personal involvement.

*Ergo*, Defendants' motion for a directed verdict in favor of Hairston and against Plaintiff on all issues arising under 42 U.S.C. § 1983 is allowed.

### Defendants Ward, Viers, and Lohman

█ With respect to the remaining supervisory officials within the DCFS, the evidence adduced at trial *may* have established facts sufficient to support an inference that their personal involvement caused the alleged violations of Plaintiff's rights. As summarized in the previous sections of this opinion, each of these Defendants were more directly involved in the investigation and handling of Plaintiff's grievances. Further, there are facts which indicate that these officials became aware of Tapen's alleged conduct during the time Plaintiff was under consideration for the social worker position, and prior to the time acts of retaliation (such as Plaintiff's transfer) occurred. Thus, it is possible that the deprivations of Plaintiff's rights, if proven, could have occurred at the direction of these officials or with their express consent. *See Soderbeck v. Burnett County, supra*, 752 F.2d at 294.

*Ergo*, Defendants' motion for a directed verdict in favor of Defendants Ward, Viers, and Lohman is DENIED.

### Due Process

Plaintiff claimed at trial that she was turned down for the social worker position on the basis of certain "non-merit" reasons prohibited by Department of Personnel rules, thereby giving rise to a due process violation. These rules in essence state that a job applicant will not be turned down for reasons relating to the applicant's personal life, such as the fact that that the applicant is divorced. Plaintiff has contended throughout the proceedings that those rules gave job applicants a contractual right and, thus, a property interest in not

being turned down for non-merit reasons. We find these contentions devoid of merit.[1]

The Due Process Clause of the Fourteenth Amendment provides: "No state shall ... deprive any person of life, liberty, or property, without due process of law ..." U.S. Const. amend. XIV, § 1. Both by its own terms and as interpreted by the Supreme Court, the Due Process Clause is a charter of "negative liberties." That is, the state may not legally *take away* the property, life, or liberty of a citizen without first affording that person a hearing or some other process that is due. Central to the nature of the protections provided by the Due Process Clause are the concepts of life, liberty, and property interests. Before any process whatsoever is constitutionally required, the state action must implicate one of these three specific interests.

Thus, the Due Process inquiry is two-pronged: (1) does the plaintiff have a life, liberty, or property interest in what was allegedly deprived by the state, and if so (2) what specific process or procedures is or are due? In answering the first prong of the inquiry, the Supreme Court's landmark decision in *Roth v. Board of Regents*, 310 F.Supp. 972 (W.D.Wisc.1970), *aff'd* 446 F.2d 806 (7th Cir.1971), *rev'd* 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972), is most relevant here.

In *Roth*, the plaintiff was hired as a teacher at a state college for a one-year term. When college officials did not renew his contract of employment, Roth argued that their refusal to do so violated both his First Amendment and procedural due process rights. Both the district court and the Seventh Circuit, employing the balancing test of *Cafeteria Workers v. McElroy*, 367 U.S. 886, 81 S.Ct. 1743, 6 L.Ed.2d 1230 (1961), balanced Roth's interest in being rehired and the state's interests in summary non-retention decisions and concluded that due process required that college officials provide Roth an explanation for their decision and an opportunity to be heard

regarding that decision. In affirming the district court, the Seventh Circuit observed that the requirement of a hearing would serve as a "prophylactic" against decisions based on impermissible reasons. 446 F.2d at 810.

The Supreme Court's decision in *Roth*, however, overturned the *McElroy* analysis and rejected the balancing approach for determining whether the Fourteenth Amendment mandates procedural protections concerning a state decision which adversely affects an individual. Instead, the Court held that the threshold question is whether an individual has a liberty or property interest at stake. In *Roth* itself, the Court held that a teacher terminated after one year had no property interest in his continued employment where his unilateral expectations had no basis in statute, contract, or mutually explicit understanding with the university. 408 U.S. at 578, 92 S.Ct. at 2709.

The attributes of "property" interests protected by procedural due process emerge from *Roth* and other decisions by the Supreme Court. In defining the nature of a protected property interest, Justice Stewart stated:

> We have made clear in *Roth*, that "property" interests subject to procedural due process protection are not limited by a few rigid, technical forms. Rather "property" denotes a broad range of interests that are secured by "existing rules or understandings." A person's interest in a benefit is a "property" interest for due process purposes if there are such rules or mutually explicit understandings that support his claim of entitlement to the benefit and that he may invoke at a hearing.

*Perry v. Sindermann*, 408 U.S. 593, 601, 92 S.Ct. 2694, 2699, 33 L.Ed.2d 570 (1972) (citations omitted). Further, Justice Stewart explained that the "existing rules or

---

1. The Court also finds unpersuasive Plaintiff's argument that due process required submission of Plaintiff's grievance to a fourth-level hearing. Even assuming, *arguendo,* the existence of a property interest, the number of hearings at which Plaintiff had an opportunity to present her side of the story precludes any conclusion that she was not afforded adequate procedural protections under the Due Process Clause.

understandings" need not be a formal tenure system or even an explicit contractual provision, stating that even implied contracts can be sufficient to constitute a protected property interest. *Id.* at 601–02, 92 S.Ct. at 2699–2700.

In *Roth*, the Court described the nature of a property interest in this manner:

> To have a property interest in a benefit, a person clearly must have more than an abstract need or desire for it. He must have more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it. It is a purpose of the ancient institution of property to protect those claims upon which people rely in their daily lives, reliance that must not be arbitrarily undermined. It is a purpose of the constitutional right to a hearing to provide an opportunity for a person to vindicate those claims.
>
> Property interests, of course, are not created by the Constitution. Rather, they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law—rules or understandings that secure certain benefits and that support claims of entitlement to those benefits. Thus, the welfare recipients in *Goldberg v. Kelly, supra*, [397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287,] had a claim of entitlement to welfare payments that was grounded in the statute defining eligibility for them. The recipients had not yet shown that they were, in fact, within the statutory terms of eligibility. But we held that they had a right to a hearing at which they might attempt to do so.

408 U.S. at 576–77, 92 S.Ct. at 2708–09. Applying these principles to the situation in *Roth*, the Court stated:

> Just as the welfare recipients' "property" interest in welfare payments was created and defined by statutory terms, so the respondent's "property" interest in employment at Wisconsin State University-Oshkosh was created and defined by the terms of his appointment. Those terms secured his interest in employment up to June 30, 1969. But the important fact in this case is that they specifically provided that the respondent's employment was to terminate on June 30. They did not provide for contract renewal absent "sufficient cause." Indeed, they made no provision for renewal whatsoever.
>
> Thus, the terms of the respondent's appointment secured absolutely no interest in re-employment for the next year. They supported absolutely no possible claim of entitlement to re-employment. Nor, significantly, was there any state statute or University rule or policy that secured his interest in re-employment or that created any legitimate claim to it. In these circumstances, the respondent surely had an abstract concern in being rehired, but he did not have a property interest sufficient to require the University authorities to give him a hearing when they declined to renew his contract of employment.

408 U.S. at 578, 92 S.Ct. at 2710.

■ Like the untenured teacher in *Roth*, Ms. Volk, as an applicant for a social worker position with the DCFS, had no property interest in continued employment with the DCFS. *Cf. Hemmige v. Chicago Public Schools*, 786 F.2d 280, 286 (7th Cir.1986) (no property interest in a temporary teaching certificate). Contrary to the situation found in *Sindermann, supra,* there was no evidence here that the policies of the DCFS fostered any expectation *of employment. Compare Vail v. Bd. of Educ. of Paris Union School District, No. 95,* 706 F.2d 1435 (7th Cir.1983), *aff'd* 466 U.S. 377, 104 S.Ct. 2144, 80 L.Ed.2d 377 (1984) (property interest in two years of employment pursuant to a two-year employment contract). In this case, Plaintiff has failed to establish precisely what Roth failed to establish—a right to a renewal of an employment contract.

■ Plaintiff contends, however, that the DCFS's policy that no job applicant be turned down for non-merit factors gives such an applicant a property interest in

*being fairly considered* for the position. This contention confuses the procedural nature of the Fourteenth Amendment's due process protections. The protections of *procedural* due process were never intended to ensure *substantive* fairness in employment decisions. The due process clause speaks only to the question of when some process is due. When there is a protectable property interest at stake, due process requires a hearing (or some other process) whereby an individual might attempt to establish that he was unfairly treated. *See Roth,* 408 U.S. at 576, 92 S.Ct. at 2708. Absent such an interest, no right to due process attaches.

■ For instance, in *Goldberg v. Kelly,* 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970), the Supreme Court held that welfare recipients had a claim of entitlement to welfare payments on the basis of statutes defining eligibility for them. The recipients, however, had not shown that they were, in fact, within the statutory terms of eligibility. The Supreme Court held only that they had a right to a hearing at which they might attempt to do so. Unlike *Goldberg,* Plaintiff here cannot claim a due process violation based on not being hired in violation of DCFS policy when she has no legitimate claim of entitlement to the job itself. *Cf. Misek v. City of Chicago,* 783 F.2d 98, 100 (7th Cir.1986) ("[s]ince plaintiffs had a property interest *in their jobs,* they could be dismissed only in accordance with federal due process standards."); *Dauel v. Board of Trustees,* 768 F.2d 128, 131 (7th Cir.1985). Further, even assuming

Plaintiff could have been considered to have a property right in being hired, she had the opportunity to contest the decision through the grievance procedures. Thus, a due process claim has not been established.

*Ergo,* Defendants' motion for a directed verdict as to Plaintiff's due process claims is ALLOWED.

## Class-Based Invidious Discrimination

The portion of 42 U.S.C. § 1985(3) relevent to this cause of action reads:

> If two or more persons ... conspire ... for the purpose of depriving, either directly or indirectly, any person ... of the *equal protection* of the laws ... the party so injured or deprived may have an action for the recovery of damages occasioned by such injury or deprivation, against any one or more of the conspirators.

42 U.S.C. § 1985(3) (emphasis added).

■ The wording of § 1985(3) makes it clear that the statute is applicable only to conspiracies to deprive a person of the *"equal protection of the laws."* Thus, proof of either racial or class-based discriminatory animus is required, and the class must be one intended to be protected by § 1985(3).[2] *Hossman v. Blunk,* 784 F.2d 793, 797 (7th Cir.1986); *Munson v. Friske,* 754 F.2d 683, 695 (7th Cir.1985). Similarly, a claim under the Equal Protection Clause brought pursuant to § 1983 requires a plaintiff to show intentional discrimination against him *because of his or*

---

**2.** For the purposes of this opinion, the Court accepts that women constitute one of the classes "that have been previously recognized as *possibly* supporting a § 1985(3) claim." *D'Amato v. Wisconsin Gas Co.,* 760 F.2d 1474, 1486 (7th Cir.1985) (emphasis added). In *Griffin v. Breckenridge,* 403 U.S. 88, 91 S.Ct. 1790, 29 L.Ed.2d 338 (1971), the Supreme Court held that a plaintiff must prove "some racial, or perhaps otherwise class-based, invidiously discriminatory animus" in order to state a cause of action under § 1985(3). 403 U.S. at 102, 91 S.Ct. at 1798. However, because the conspiracy in *Griffin* was aimed at a group of blacks, the Court declined to decide whether a conspiracy motivated by invidious discriminatory intent other than racial bias would be actionable. *Id.* at 102 n. 9, 91

S.Ct. at 1798 n. 9. In interpreting *Griffin,* most courts—including our circuit—have indicated that the statute covers conspiracies involving animus other than racial bias such as animus based on ethnic origin, *sex,* religion, or political loyalty. *Munson, supra,* 754 F.2d at 695; *Murphy v. Mount Carmel High School,* 543 F.2d 1189, 1191 n. 1 (7th Cir.1976). See also *Life Insurance Company of North America v. Reichardt,* 591 F.2d 499 (9th Cir.1979) (finding "women" a class within the protective ambit of 42 U.S.C. § 1985(3)). *But see Great American Federal Savings & Loan Association v. Novotny,* 442 U.S. 366, 99 S.Ct. 2345, 60 L.Ed.2d 957 (1979) (42 U.S.C. § 1985(3) does not cover claims such as sex discrimination for which other statutory remedies exist).

her membership in a particular class. *Personnel Administrator v. Feeney*, 442 U.S. 256, 279, 99 S.Ct. 2282, 2296, 60 L.Ed.2d 870 (1979); *Huebschen v. Dept. of Social Services*, 716 F.2d 1167, 1171 (7th Cir.1983).

■ Pursuant to the equal protection requirement of class-based animus, no jury could conclude that Plaintiff was discriminated against on the basis of her membership in the class of women. From the evidence adduced at trial, a jury *could* infer that Ms. Volk herself was treated differently from others in the office; the evidence can only show, however, that such disparate treatment was based on the fact that her supervisor singled her out *as an individual.* For instance, no witness testified that Tapen treated women as a group differently than men. Instead, the evidence in Plaintiff's favor was directed solely toward the particular problems Tapen had with Ms. Volk herself.

In *Huebschen v. Dept. of Health & Social Services*, 716 F.2d 1167, 1171 (7th Cir. 1983), the Court explained that "[a] person bringing an action under the Equal Protection Clause must show intentional discrimination against him because of his membership in a particular class, not merely that he was treated unfairly *as an individual."* *Id.* at 1171 (emphasis added). Further, "the decisionmaker [must have] selected or reaffirmed a particular course of action at least in part 'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group." *Id.* (*quoting Personnel Administrator v. Feeney*, 442 U.S. 256, 279, 99 S.Ct. 2282, 2296, 60 L.Ed.2d 870 (1979)).

*Huebschen* itself was a sexual harassment claim made by a man (Huebschen) against his female supervisor (Rader). In that case, the two had been involved in a consensual romance. The romance ended abruptly in November of 1979, at which time the female supervisor reacted spitefully toward Huebschen by recommending that he be demoted. Under these facts, the Court held that Rader discriminated against Huebschen not because he was a man, but rather as an individual; further, that the evidence in the case established that Huebschen's gender was "merely coincidental to Rader's action." Because the evidence established that Rader's motivation in demoting Huebschen was that he was a former lover who had jilted her rather than the fact that he was male, the Court found that Plaintiff had not established a claim under the Equal Protection Clause. The Court continued:

Thus the proper classification, if there was one at all, was the group of persons with whom Rader had or sought to have a romantic affair. It was this group, of which Huebschen may have been the only one, that Rader sought to disadvantage. As unfair as Rader's treatment of Huebschen may have been, *we simply are not persuaded that the Equal Protection Clause should protect such a class.*

*Id.* at 1172 (emphasis added).

■ Although Plaintiff does submit evidence that at least one other woman in the office was treated unfairly, the quote above makes it clear that the Equal Protection Clause does not protect a group of persons with whom the Defendant sought to have a romantic affair. The Constitution does not reach every form of injustice in the employment setting. Rather, it guards against discrimination based on membership in a protected class. Clearly women are such as class; the mere fact that the Plaintiff is a woman does not, however, establish class-based animus. Here the evidence can only support the conclusion that Plaintiff was treated unfairly as an individual. Therefore, Plaintiff has failed to prove the element of class-based animus necessary to sustain an equal protection violation under §§ 1983 and 1985.[3]

---

**3.** In addition to the inadequacy of the proof, the single, intra-entity conspiracy which Plaintiff attempts to prove does not establish a legal claim under § 1985. *Dombrowski v. Dowling*, 459 F.2d 190 (7th Cir.1972); *But see Craft v. Board of Trustees*, 516 F.Supp. 1317, 1324 (N.D.Ill. 1981) (Flaum, J., found § 1985(3) applicable where the employees of a business entity en-

## Conclusion

In accordance with the foregoing, Defendants' motion for a directed verdict is ALLOWED with respect to Defendants Coler and Hairston on all issues, ALLOWED as to Plaintiff's equal protection and due process claims under §§ 1983 and 1985, and DENIED as to the remaining Defendants on Plaintiff's First Amendment and retaliation claims under § 1983.

gaged in a continuing "series of discriminatory acts.")